# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**                **Case No.  23-20201**
                                                 **Hon. Judith E. Levy**

**-vs.-**

**RONALD NORVALE WILLIAMS,**

| **Motion to Dismiss the Indictment** |
| --- |

                    **Defendant.**

_____/

| United States of America | Federal Community Defender Office |
| --- | --- |
| By:  Brandy McMillon | By: Brandy Y. Robinson |
| Assistant United States Attorney | Attorney for Ronald Williams |
| 211 W. Fort Street, Suite 2001 | 613 Abbott, Suite 500 |
| Detroit, Michigan 48226 | Detroit, Michigan 48226 |
| (313) 226-9100 | (313) 967-5542 |
| brandy.mcmillion@usdoj.gov | brandy_robinson@fd.org |

_____/

## MOTION TO DISMISS

      RONALD WILLIAMS, through counsel, Brandy Robinson of the FEDERAL COMMUNITY DEFENDER OFFICE,  respectfully moves this Court to dismiss the indictment under the Second Amendment to the United States Constitution. In support, Mr. Williams states:

1. Mr. Williams is charged by Indictment with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1).

2.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court of the United States announced a new, dramatic shift in Second Amendment law.

3.  Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts to instead consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law is "constituent with the Nation's historical tradition of firearm regulation." *Id.*

4.  Under the new framework mandated by *Bruen*, the Court should dismiss the Indictment against Mr. Williams, which charges him with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Williams's conduct is presumptively protected. The government will be unable to rebut that presumption.

5.  Additionally, in *Range v. Att'y Gen.*, No. 21-2835, 2023 WL 3833404 (3d Cir. June 6, 2023) (en banc), the Third Circuit recently rejected the government's claim that only "law-abiding, responsible citizens" are counted among "the people"

protected by the Second Amendment.  The Court therefore found that the petitioner could not be held criminally liable under 18 U.S.C. § 922(g)(1) despite his 1995 false statement conviction.

6.  Though other courts have concluded otherwise, Mr. Williams seeks to preserve the issue in case the law continues to develop in a manner consistent with the majority opinion in *Range*.

7.  Counsel for the government disagrees and does not concur in the relief requested. *See* LR 7.1.

WHEREFORE, Mr. Williams respectfully asks this Court to dismiss the indictment.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF MICHIGAN**

s/Brandy Y. Robinson
BRANDY Y. ROBINSON (P66895)
Attorney for Ronald Williams
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5852
E-mail:  brandy_robinson@fd.org

Dated:  June 15, 2023

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

-vs.-

**RONALD NORVALE WILLIAMS,**

        **Defendant.**

**Case No.  23-20201**
**Hon. Judith E. Levy**

| **Motion to Dismiss the Indictment** |

/

| United States of America | Federal Community Defender Office |
|---|---|
| By:  Brandy McMillon | By: Brandy Y. Robinson |
| Assistant United States Attorney | Attorney for Ronald Williams |
| 211 W. Fort Street, Suite 2001 | 613 Abbott, Suite 500 |
| Detroit, Michigan 48226 | Detroit, Michigan 48226 |
| (313) 226-9100 | (313) 967-5542 |
| brandy.mcmillon@usdoj.gov | brandy_robinson@fd.org |

/

## BRIEF IN SUPPORT OF MOTION TO DISMISS

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marks a dramatic shift in Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts to instead consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the

4

government must show that a challenged law is "constituent with the Nation's historical tradition of firearm regulation." *Id.* This test is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted. *Id.* at 2136. Felon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment.

Under the new framework mandated by *Bruen*, the Court should dismiss the Indictment against Mr. Williams, which charges him with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Williams's conduct is presumptively protected. The government will be unable to rebut that presumption.

## I.      Procedural History

Mr. Williams is charged in a one-count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The felonies underlying this charge stem from his 1987 convictions for first and second-degree murder arising from a single incident.  Because Mr. Williams was 17 at the time of the killings, he was eventually resentenced from the original penalty of non-parolable life to a term of 25-60 years, based on *Miller v. Alabama,* 567 U.S. 460 (2012).  Mr. Williams was on parole from this sentence at the time he allegedly possessed the gun at issue in the current case.

## II.     Legal Background

### A. Before *Bruen*, lower courts analyzed Second Amendment challenges by applying means-end scrutiny

The Second Amendment provides, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). Based on a survey of the history of the Second Amendment, the Court concluded the right is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 662. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years later in *McDonald v. City of Chicago*, the Court reaffirmed *Heller's* "central holding" that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 762, 780 (2010). In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. And that right, the Court warned, should not be treated

"as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appl[ied] the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

**B.** ***Bruen*** **replaced means-end balancing with a test rooted solely in the Second Amendment's "text and history."**

*Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller's* methodology. *Id.* at 2138. That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's

7

conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this question in *Bruen* was straightforward: New York required applicants to demonstrate "proper cause" to open carry outside the home, i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court explained: "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent … evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. If there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant.

8

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). Thus, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[1] Courts may look to the tradition of firearms regulation "before … and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137. Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history

---

[1] The Court reserved as to the question of whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38

to the extent it provides "confirmation" of prior practice with which it consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

Because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court staked certain guideposts for lower courts to follow, including that "[i]n some cases," the historical inquiry "will be fairly straightforward.":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced

approach." *Id.* at 2132. When firearms post "regulatory challenges" that are "not … the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* In assessing analogues, the Court identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court also stressed the limits of reasoning by analogy, explaining that "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original).

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. A handful of "outlier[]"

statutes or cases from a small number of "outlier jurisdictions" do not amount to a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt" that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-Century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that the burden falls on the government of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See, e.g., id.* at 2127, 2130. Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute." *Id.* at 2150.

## III.   Argument

Under *Bruen*, § 922(g)(1) violates Mr. Williams's Second Amendment right. A total prohibition on firearm possession by felons presumptively violates the Second Amendment, and the government cannot rebut that presumption. The Court should dismiss the indictment.

**A. The government will be unable to carry its burden of establishing a historical tradition of felon-disarmament laws.**

The plain text of the Second Amendment covers Mr. Williams's conduct. To start, Mr. Williams is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests that those who have been convicted of a felony are unentitled to the amendment's protection. *Id.* On the contrary, "the people" is a term that "unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added); *Accord, Range v. Att'y Gen.*, No. 21-2835, 2023 WL 3833404, at *5 (3d Cir. June 6, 2023) (en banc) (noting that "the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people," and nothing that such extreme deference "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.").

The Second Amendment right—like the rights of "the people" in other amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added). Interpreting "the people" to exclude felons would conflict with that principle. It follows that even "dangerous felons" "are indisputably part of 'the people'" for Second Amendment purposes. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir.

2015) (concluding "the people" extends to all "persons who are part of a national community").

Because the Second Amendment's plain text covers Mr. Williams's conduct, the Constitution presumptively protects it. *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is designed to address—i.e., ex-felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The government cannot.

Section 922(g)(1) traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus § 922(g)(1) "is firmly rooted in the

14

twentieth century," *Booker*, 644 F.3d at 24—a century and a half after adoption of the Second Amendment. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, *Bruen* refused to even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes, § 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). A leading survey of laws pertaining to gun regulation in the thirteen colonies and Vermont concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142-43 & n.11 (2007). Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009); *see* Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009)(observing

that "state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century"). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *accord N.R.A.*, 700 F.3d at 197 ("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult to make."). In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31.

The government cannot attempt to justify § 922(g)(1) by resorting to "analogical reasoning." *Id.* at 2132. Under *Bruen*, that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at

16

the founding." *Id.* The potential danger posed by felons' access to firearms was neither unprecedented nor unimaginable to the Founders. The Founders could have adopted laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by violent felons. *Id.* at 2131. But they did not.

Even if analogical reasoning were appropriate in this case, however, it would not aid the government. Mr. Williams is unaware of a founding-era statute "relevantly similar" to § 922(g)(1). *Id.* at 2132; *see also Range supra,* No. 21-2835, 2023 WL 3833404, at *8 (3d Cir. June 6, 2023) (rejecting the Government's attempts to show that the Nation's historical tradition of firearms regulation supports depriving Range of his Second   Amendment   right   to   possess   a   firearm). Mr. Williams submits that the government will be unable to shoulder its burden of rebutting the presumption of unconstitutionality.

**B.** *Heller's* **statements about "presumptively lawful regulatory measures" and "law-abiding, responsible citizens" do not control this case.**

The government may point to two passages from *Heller* that supposedly place felons outside the protection of the Second Amendment. It may argue these passages deem felon-disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens." Neither passage justifies ignoring *Bruen's* clear command. The first was dicta and, in any event, has been superseded by the new *Bruen* framework; the second establishes a constitutional baseline that protects, rather than limits, Second Amendment rights.

1. *"Presumptively lawful regulatory measures"*

*Heller* remarked that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. It then added the language that Mr. Williams expects the government to cite:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

In other cases, the government has argued this portion of *Heller* definitively establishes that felon-disarmament laws are consistent with the Second Amendment. That view is mistaken. The question of felon-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g., Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful"

language as "the opinion's *deus ex machina* dicta"). Thus, the passage cited above should not be treated as a holding, but rather a caution not to read *Heller* too broadly. *Skoien*, 614 F.3d at 640. Courts, including the en banc Sixth Circuit have thus called this passage "precautionary language" and have refused to give it any "conclusive effect," particularly given the "lack of historical pedigree" for the challenged prohibition. *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc); *See also, Range,* No. 21-2835, 2023 WL 3833404, at *4 (3d Cir. June 6, 2023) (noting that the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases, rendering those their references to "law-abiding, responsible citizens" as dicta that should not be over-read).

Of course, lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Yet courts are only obligated to follow Supreme Court dicta when there is "not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *ACLU of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010). And courts may disregard dicta for which the Supreme Court provides no reasoning or analysis. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) ("[W]e conclude that the brief

19

dictum to which we allude should not dictate the result here."); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (choosing to follow Supreme Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "presumptively lawful regulatory measures" is the kind of Supreme Court dicta unentitled to treatment as binding. *In re Bateman*, 515 F.3d at 283. It was, "precautionary, not conclusive," *Tyler*, 837 F.3d at 687, "unaccompanied by any analysis," *In re Bateman*, 515 F.3d 272, 283 (4th Cir. 2008), and—at best—"peripheral" to the questions at issue, *Hengle*, 19 F.4th at 347. *Heller* provided no "extended discussion" of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting). Indeed, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, 56 U.C.L.A. L. Rev. at 1567; *see also United States v. Chester*, 628 F.3d 673,

679 (4th Cir. 2010) ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

But as explained above, felon-disarmament laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted such a law until the 20th Century, and Congress did not pass the federal statute at issue here until 1938. *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just dicta, but dicta based on a factually unsupportable premise. That is a slender reed on which to rest the categorical denial of an enumerated constitutional right. Absent "historical evidence conclusively supporting a permanent ban on the possession of guns" by felons, "it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right based on a past [felony conviction]." *See Tyler*, 837 F.3d at 687. Thus, the Sixth Circuit refused to give *Heller*'s dicta conclusive effect in the context of § 922(g)(4)'s prohibition of firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," especially given "§ 922(g)(4)'s lack of historical pedigree."

*Heller* itself indicates that its dicta should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues"

to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right *if that deprivation is consistent with history and tradition.*" Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) (emphasis added). The Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws would make no sense if the Court believed felons could be disarmed *regardless* of whether history supported that exclusion.

And—crucially—the Court stressed that it had not canvassed the historical record and made a determination one way or the other about whether that record supported felon-disarmament laws. *Heller*, 554 U.S. at 626. *Bruen*, in turn, affirmed that *Heller* did not purport to settle any questions beyond those necessary to resolve the petitioners' claim. 142 S. Ct. at 2128. It is therefore "particularly wrongheaded to read [*Heller*] for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

Even more telling is *Heller*'s discussion of *Lewis v. United States*, 445 U.S. 55 (1980). The defendant in that case, who was convicted under the federal felon-in-possession statute, argued the prosecution violated his equal-protection rights because his underlying felony conviction had been secured in the absence of

counsel. *Lewis*, 445 U.S. at 58, 65. The Court rejected that argument, reasoning that Congress "could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." *Id.* at 66. In *Heller*'s words, the *Lewis* Court then "commented gratuitously, in a footnote," on a Second Amendment question that was not "raised or briefed by any party." 554 U.S. at 625 n.25. *Heller* called it "inconceivable" that the Court would rest its "interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." 554 U.S. at 625 n.25.

To accept, as the government will argue, that *Heller* settled the constitutionality of felon-disarmament laws would be to do exactly what that case called "inconceivable": interpreting "the basic meaning" of the Second Amendment based on "a footnoted dictum in a case where the point was not at issue and was not argued." *See* 554 U.S. at 627 n.26 (describing felon-disarmament laws, in a footnote, as "presumptively lawful regulatory measures"). Indeed, treating *Heller*'s "presumptively lawful" language as binding would be especially ironic given that, in the footnote *Heller* disclaimed as dicta, *Lewis* suggested felon-disarmament laws do not violate the Second Amendment. *Lewis*, 445 U.S. at 65 n.8 (citing three court of appeals opinions to that effect).

Finally, even if the *Heller* dicta might once have warranted deference, it no longer does. Lower courts need not follow Supreme Court dicta that is

"undermined" or "enfeebled by later statements" in other Supreme Court cases. *ACLU of Kentucky*, 607 F.3d at 447; *Hengle*, 19 F.4th at 347. Even if *Heller* did not cast doubt felon-in-possession laws, *Bruen*'s new framework *does*, as explained above. To elevate *Heller*'s dicta over *Bruen*'s holding would improperly treat the Second Amendment right "as a second-class right." *McDonald*, 561 U.S. at 780.

### 2. *"Law-abiding, responsible citizens"*

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms.

This argument misreads *Heller*. *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, *at the very least*, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its

reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling.

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and gave no hint that decision contradicted *Heller*. *Bruen* thus confirms that *Heller*'s "law-abiding, responsible citizens" language is not a decided limitation on the Second Amendment.

*Heller* also used the word "law-abiding" during a discussion of *United States v. Miller*, 307 U.S. 174 (1939), which the District of Columbia had cited to support its collective-rights view of the Second Amendment. The *Heller* Court wrote that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This reference to "law-abiding" citizens, like the last, does not suggest, much less hold, that *only* the law-abiding enjoy Second Amendment rights. As the *Heller* Court emphasized, *Miller* addressed "the *type of weapon[s]*" that are "eligible for Second Amendment protection"—which *Heller* explicitly contrasted with the question of the *type of people* who are eligible for Second Amendment protection. *Id.*

at 622 (emphasis in original); *see United States v. Perez*, 6 F.4th 448, 451 (2d Cir. 2021)

("[*Heller*] considered the scope of the Second Amendment along two dimensions:

what types of 'arms' are protected and who are among 'the people.'"). *Heller*'s use

of the word "law-abiding," therefore, provides no support for the view that felons

are unentitled to the Second Amendment's protection.

Mr. Williams recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding

citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause

requirement violates the Fourteenth Amendment in that it prevents law-abiding

citizens with ordinary self-defense needs from exercising their right to keep and

bear arms."). But the petitioners framed themselves as "law-abiding citizens," and

the Court granted certiorari to decide only whether "New York's denial of

*petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis

added). No other questions were before the Court. Just as *Heller*'s description of

the right to bear arms "in the home" does not mean the Second Amendment is

inapplicable to other *places*, *Bruen*'s description of "law-abiding citizens" does not

mean the Second Amendment is inapplicable to other *people*.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the

opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is

that history is paramount in Second Amendment interpretation. *See, e.g.*, *id.* at 2127

("[*Heller*] demands a test rooted in the Second Amendment's text, as informed by

history."); *id.* ("[*Heller*] looked to history because 'it has always been widely

26

understood that the Second Amendment . . . codified a *pre-existing* right.'" (emphasis in original)); *id.* at 2128-29 *id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach").

Yet as explained above, the historical record provides no support whatsoever for felon-disarmament laws. The government's position would have this Court hold, based solely on the implication from a negative pregnant unnecessary to *Bruen*'s holding, that the question of whether non-law-abiding citizens can possess firearms is—uniquely among all issues of Second Amendment interpretation—exempt from the requirement that the amendment's scope be firmly rooted in history. Nothing in *Bruen* permits that result.

## IV.    CONCLUSION

Section 922(g)(1) violates the Second Amendment as it was understood at the time of its adoption. Mr. Williams respectfully requests this Court dismiss the indictment.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF MICHIGAN**

s/Brandy Y. Robinson
BRANDY Y. ROBINSON (P66895)
Attorney for Ronald Williams
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5852
E-mail:  brandy_robinson@fd.org

27

Dated:  June 15, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2023, I electronically filed the above document with the Clerk of the Court using the CMECF filing system, which will send notification of the filing to opposing counsel of record.

/s/ Brandy Y. Robinson