UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                    Case No.  23-20201
                                                   Hon. Judith E. Levy

-vs.-

RONALD NORVALE WILLIAMS,

> Second Supplemental Brief in Support of *Bruen* Motion to Dismiss

                    Defendant.

| United States of America | Federal Community Defender Office |
|---|---|
| By:  Louis Metrish | By: Brandy Y. Robinson |
| Assistant United States Attorney | Attorney for Ronald Williams |
| 211 W. Fort Street, Suite 2001 | 613 Abbott, Suite 500 |
| Detroit, Michigan 48226 | Detroit, Michigan 48226 |
| (313) 226-9100 | (313) 967-5542 |
| louis.metrish@usdoj.gov | brandy_robinson@fd.org |

      Without question, January 20, 1987 was the worst day of Ronald Williams' life.

It was on that day, at just seventeen years old, that Ronald raised a pistol and took the

lives of not just one, but two people. His actions left a seven-year old child orphaned.

      When the trial judge sentenced him back in December of 1987 to a mandatory

term of non-parolable life[1] in prison, Ronald thought his own life was over. Of

course, the judge had no discretion, so Ronald accepted the penalty, and entered into

---

[1] As noted in the First Supplemental Brief, Mr. Williams received a parolable life
sentence for the second-degree murder conviction.  Both of those prison terms were
set to run consecutive to a two-year penalty for felony-firearm.

the custody of the Michigan Department of Corrections (MDOC) for what he thought would be forever.

Ronald would have never conceived that twenty-five years later, the United States Supreme Court would deem it illegal to sentence a child to die in prison "even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence . . . more appropriate." But that was exactly the ruling in *Miller v. Alabama*, 567 U.S. 460, 465 (2012). With that opinion, it became the law of the land that "mandatory life without parole for those under the age of 18 at the time their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments."

The Court's opinion was issued with good reason. Citing its prior precedent in *Roper v. Simmons*, 543 U.S. 551(2005) and *Graham v. Florida*, 560 U.S. 48, 68 (2010), Justice Kagan writing for the majority explained that "children are constitutionally different from adults," and because they have "diminished culpability and greater prospects for reform . . .they are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471. The Court noted that its prior decisions rested not only common sense and what any parent knows, but on science as well.

The Court pointed to several studies showing that '[o]nly a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior." *Id.* (internal quotations omitted). It reasoned that young people's tendencies of "transient rashness, proclivity for risk, and inability to assess

2

consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'" *Id.* at 472. The Court reiterated: "[m]ost fundamentally, *Graham* insists that **youth matters** in determining the appropriateness of a lifetime of incarceration without the possibility of parole." *Id.* at 473 (emphasis added).

As a result of the opinion, Mr. Williams was given the grace of a second chance. With the help of a very capable legal team, Mr. Williams presented the trial court with extensive proof of his decades-long rehabilitation and broad community and institutional support. For the integrity of the record, counsel shares some of that mitigation work here.

First, re-sentencing counsel presented the court with research prepared by University of Michigan Psychology Professor Daniel P. Keating, Ph.D., who affirmed the Court's finding in *Miller*. [Condensed Resentencing Memorandum, Exhibit A]. He opined that juvenile decision-making is influenced by several factors, including the immaturity of the pre-fontal cortex and centers of executive functioning. He also noted that the developmental neuroscientific evidence suggests that, as compared to adults, "there are increased prospects for change among juveniles," particularly because part of their brain circuitry is not fully settled until well into a person's mid-20s. *Id.*

Counsel also furnished a variety of MDOC records, including work and educational reports demonstrating Ronald's deep investment in his own development

throughout his incarceration. [Condensed Resentencing Memorandum, Exhibit A].

And in addition to providing sentencing letters and a mitigation report, Counsel

included evidence of Ronald's unique talent for both artistry and writing, which he

combined into two children's books. [Exhibit B, Combined Artwork]; [Exhibit C,

Crusader Workbook]; [Exhibit D, Young People's Guide to Drawing].

 The trial judge carefully considered every aspect of the re-sentencing

presentation, including Ronald's words to the victims' family:

```
17              MR. WILLIAMS: That right there was amazing.
18      I never thought I would ever hear that from any family
19      member.  When there's a death in the family, that death
20      changes the whole dynamics of that family.  And when the
21      family is, when a family member is killed, that almost
22      destroys the whole fiber of that unit.  And not only did
23      I do that to one, I did it to two.
24              I won't offer no excuse because there is no
25      excuse.  There is no justification.  I did not give them
```

                                    -20-

```
1      people life.  I had no right to take it.  However, I was
```

[Excerpt from Resentencing Transcript at 21-22, Exhibit E].

Ronald shared his perspective on the killings at the time, and concluded his remarks by apologizing to the family and explaining how he has carried nearly three decades worth of regret.

Totally **<u>absent</u>** from the hearing was any indication whatsoever that Ronald Williams posed an ongoing threat of physical violence to <u>anyone</u>, or that his rehabilitation journey was feigned or incomplete.

Given the (1) the lengthy passage of time, (2) Mr. Williams' rehabilitation from violent crime, (3) the lack of any exception to the felon-in-possession statute's operation and (4) the fact that the government cannot identify a single permanent disarmament ban from the founding era, the defense submits that the application of 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him and asks that the indictment be dismissed.

I.   **Even assuming § 922(g)(1) is facially constitutional, it violates the Second Amendment as applied to Mr. Williams.**

*Introduction.* It is true that Ronald Williams has several §922(g)(1) predicate convictions that render him ineligible to possess a firearm under current law. The government has not demonstrated, however, that near the time of the founding, there existed a robust tradition of disarming people convicted of these types of crimes (assault, burglary, drugs, etc.). Because the historical record does not show that the founding generation disarmed people like Mr. Williams, he asks the Court to hold that § 922(g)(1) is unconstitutional as applied. *See Range*

*v. Att'y Gen.*, 69 F.4th 96, 104-06 & n.9 (3d Cir. 2023) (en banc) (holding § 922(g)(1) violates Second Amendment as applied to defendant with conviction for food-stamp fraud); *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *1, 12-13 (M.D. Pa. Sept. 1, 2023) (same, for defendant with "at least thirteen prior felony" convictions, including "multiple armed robberies and drug trafficking convictions"); *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023) (same, for defendant with convictions for manslaughter, aggravated assault, fleeing law enforcement, and attempted aggravated assault of a law enforcement officer); *United States v. Forbis*, No. 4:23-cr-133, ECF 37 at 1-2 (N.D. Okla. Aug. 17, 2023) (same, for defendant with convictions for possessing methamphetamine and driving under the influence); *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *1, 11-12 (M.D. Pa. Aug. 22, 2023) (same, for defendant with four convictions for possession of heroin and cocaine with intent to distribute).

   *Governing Legal Standards*. The Second Amendment provides that

> A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court "recognized that the Second and Fourteenth Amendments protect the rights of ordinary, law-abiding citizens to possess a handgun in the home for self-defense." N.Y. *State Rifle & Pistol Association, Inc. v. Bruen*,

—— U.S. ——, 142 S. Ct. 2111, 2122 (2022). The *Bruen* Court further held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, at 2126. To withstand scrutiny under *Bruen*, the Government must prove that the challenged law is consistent with the Nation's historical tradition of firearm regulation. *Id.* Only then may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command." *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U. S. 36, 50, n. 10 (1961)). It is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127.

The *Bruen* Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not

"rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.") (citing *District of Columbia v. Heller*, 554 U.S. 570, 579-81 (2008)). Evidence from "the mid- to late-19th century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice, but should otherwise afford it little weight. *Id.* That is because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too temporally remote).

Applying the analysis to the law before it, the *Bruen* Court held that because New York could not point to a robust tradition of regulations similar to the

8

proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow.

> **a)   Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new.

In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131; *see also id.* at 2131-32 (describing inquiry as "simple" and "straightforward"). To defend such statutes, the government must point to a tradition of "distinctly similar historical regulation[s]." *Id.* at 2131. If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.* Conversely, statutes addressing longstanding problems are likely *un*constitutional if (1) "earlier generations addressed the societal problem, but did so through materially different means," or (2) some jurisdictions in the founding era attempted to enact laws analogous to the challenged regulation, but "those proposals were rejected on constitutional

9

grounds." *Id.*

In "other cases," a modern statute will be aimed at "unprecedented societal concerns or dramatic technological changes" that would have been "unimaginable at the founding." *Id.* at 2132. Challenges to these statutes "may require a more nuanced approach." *Id.* Instead of asking whether the modern statute and historical precursors are "*distinctly* similar," courts should ask whether they are "*relevantly* similar." *Id.* (emphasis added). *Bruen* identified "at least two metrics" to use in the "relevantly similar" inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden is comparably justified [the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* (emphasis in original).

This latter approach to *Bruen*'s historical inquiry—the "relevantly similar" standard—is less difficult for the government to satisfy. But courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131; *see, e.g.*, *Range*, 69 F.4th at 103 ("To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue. But 'modern regulations that were

unimaginable at the founding' need only be 'relevantly similar' to one."); *United States v. Marique*, No. CR 22-00467-PJM, 2023 WL 5338069, at *2 (D. Md. Aug. 18, 2023) ("When evaluating evidence of a historical tradition of firearms regulation, *Bruen* instructs courts to use different tests depending on the kind of problem a regulation addresses. Where a regulation 'addresses a general societal problem that has persisted since the 18th century,' the government must point to a tradition of 'distinctly similar historical regulations' when defending the statute. Conversely, if a modem statute is aimed at 'unprecedented societal concerns or dramatic technological changes' not present at the founding, courts are directed to ask whether the modern statute and historical precursors are 'relevantly similar' rather than 'distinctly similar.'").

At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. 142 S.Ct. at 2132. The answer to this question dictates whether courts apply the "distinctly similar" test or the "relevantly similar" test. *See United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) ("Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? 'Distinct' similarity or a less precise 'relevant' similarity? That depends on whether § 922(g)(3) 'addresses a general societal problem that has

11

persisted since the 18th century' or an 'unprecedented societal concern' that the Founding generation did not experience.").

      **b)**    **The government must identify a "well-established and representative" tradition of comparable regulations.**

    Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic").

    A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 2148 n.24; *see also Atkinson v. Garland,* 70 F.4th 1018, 1029 (7th Cir. 2023) (Wood, J., dissenting) ("[T]he historical analogues must be abundant, though they need not appear in

every jurisdiction.").

        c)    **The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.**

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. In consequence, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

        d)    **The Court's task is to assess conduct, not status, at the first step of the *Bruen* inquiry.**

The government tries to redirect the Court's focus to whether felons enjoy Second Amendment protection at all. But it is important to begin the assessment using the correct analytical framework, as instructed by *Bruen*. The opinion is clear that the Court's first inquiry must be whether the *conduct* at issue in this case is covered

13

by the Second Amendment's plain text, not whether Mr. Williams's particular *status* as a felon is protected. *See Bruen* , 142 S. Ct. 2117 (emphasis added); *United States v. Rowson*, No. 22 Cr. 310, 2023 WL 431037, at *15 (S.D.N.Y. Jan 26, 2023) (noting *Bruen* focused on the "conduct" the statute proscribed, not on disqualifying status characteristics of the individuals challenging the statute); *United States v. Quiroz*, No. 22-CR-00104, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022) (noting an individual's conduct, rather than their status, is what needs to be analyzed to determine if it is protected by the plain text of the Second Amendment); *United States v. Bartucci*, No.19-cr-00244, 2023 WL 2189530 (E.D. Cal. Feb. 23, 2023) (same); *United States v. Kays*, No. CR-22-40, 2022 WL 3718519, at *2 (W.D. Okl. Aug. 29, 2022) (same); *United States v. Hicks*, No. 21-CR-00060, 2023 WL 164170, at* 4 (W.D. Tex. Jan. 9, 2023) (analyzing conduct proscribed by statute and finding that receiving a firearm is encompassed by "to keep and bear arms" text of the Second Amendment).

    With these standards in mind, the defense now turns its attention to the inquires posed by the Court's July 25, 2023 order.

## II.     Defense Responses to the Court's Questions

## 1.  Is Defendant part of "the people"?

**Yes.** The Constitution does not define "the people" or "right of the people." But to resolve this question, the Court first turns to the text of the Second Amendment, and then to the majority opinion authored in *Heller*, 554 U.S. at 579-81.

First examining the text, the phrase "the People" appears in the Constitution's Preamble ("We the People of the United States, in Order to form a more perfect Union . . .  do ordain and establish this Constitution for the United States . . . ."). It also exists in connection with the individual liberties in the Bill of Rights, including the right to peaceable assembly under the First Amendment ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. . . . ."); and to be free from illegal search and seizure under the Fourth Amendment ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .")

The Constitution also speaks to the reservation of rights under both the Ninth Amendment ("[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people . . . .") and the Tenth Amendment ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

15

people.").  Courts have therefore hesitated to interpret "the People" in a manner that is  artificially narrow and inconsistent with its usage in other parts of the Constitution.

The *Heller* Court affirmed this view. The majority reiterated that the Second Amendment right "to keep and bear Arms," codified a pre-existing "right of the people," and "unambiguously refers to **all** members of the political community, not an unspecified subset." *Id.* at 579-80 (describing the use of the term "the people" in the Constitution's Preamble, Article I § 2, the First Amendment, the Fourth Amendment, the Ninth Amendment and the Tenth Amendment) (emphasis added). Citing its own opinion in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265 (1990), the *Heller* Court reiterated that "'[t]he people' seems to have been a term of art" which refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller,* 554 U.S. at 580. It concluded by announcing a strong presumption that the Second Amendment right "belongs to **all** Americans." *Id.* at 581 (emphasis added).

Relying on this language, several courts have declined the government's invitation to pre-emptively exclude unpopular groups from the Second Amendment's protection, including felons. The Third Circuit's *en banc* opinion in *Range* explained the analytical problems that come with attempting to reserve gun rights to so-called virtuous Americans:

16

[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague. Who are 'law-abiding' citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No. We are confident that the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment. Perhaps, then, the category refers only to those who commit 'real crimes' like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. But today, felonies include a wide swath of crimes, some of which seem minor. And some misdemeanors seem serious. As the Supreme Court noted recently: 'a felon is not always more dangerous than a misdemeanant.' As for the modifier 'responsible'" it serves only to undermine the Government's argument because it renders the category hopelessly vague. In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen.

69 F.4th at 102 (citations omitted). The Court rightly noted the danger of authorizing legislators to decide who can be excluded from "the People," as it risks giving lawmakers "unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* at 103. In rejecting the government's constrained reading of the Constitution's text, the *Range* court does not stand alone.

In a dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, then-Judge Amy Coney Barrett reasoned that "[n]either felons nor the mentally ill are categorically excluded from our national community."  Noting that this fact alone does not end the analysis or preclude any further government regulation of these individuals, she instead noted that the proper

17

question is "whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.*

In similar fashion, an increasing number of lower courts considering §922(g)(1) challenges have also rejected the government's view that the Second Amendment right belongs **only** to law-abiding, responsible citizens. *See, e.g. United States v. Davila*, No. 23-CR-292, 2023 WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023) (rejecting facial and as-applied challenge to §922(g)(1) but finding "no basis for reading 'the people' in the text of the Second Amendment to exclude felons."); *United States v. Holmes*, No. CR 23-20075, 2023 WL 4494340, at *1 (E.D. Mich. July 12, 2023) (same but finding that "[d]espite being a felon, the Second Amendment's plain text covers Mr. Holmes' conduct."); *Bullock*, *supra*, at *20, 29 (adopting reasoning of *Range* and noting the importance of focusing on the <u>conduct</u> being regulated, not the <u>status</u> of the person engaging in the conduct); *United States v. Hernandez*, No. 3:23-CR-0056, 2023 WL 4161203, at *3-4 (N.D. Tex. June 23, 2023) (noting hesitation with definitively concluding that felons are outside the scope of "the People" who enjoy Second Amendment protections); *United States v. Melendrez-Machado*, No. 22-CR-00634, 2023 WL 4003508, at *4 (W.D. Tex. June 14, 2023) (rejecting §922(g)(1) challenge but acknowledging strong support for the finding that "all Americans, regardless of their criminal background, are included in 'the people' protected by the Second Amendment."); *United States v. Ware*, No. 22-CV-30096, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023) (citing *Kanter* dissent in noting that a person convicting of a

qualifying crime does not automatically lose his right to keep and bear arms, and that it is important to interpret the meaning of "the People" consistently across different Constitutional rights); *United States v. Lowry*, No. 1:22-CR-10031, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023) (recommending denial of facial and as-applied challenge to §922(g), but finding that felons are not categorically excluded from "the People," interpreted by *Heller* to mean "All Americans."); *United States v. Martin*, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023) (noting that individuals convicted of felonies are members of the political community and therefore part of "the people" for the purposes of the Second Amendment); *United States v. Barber*, No. 4:20-CR-384, 2023 WL 1073667, at *5-6 (E.D. Tex. Jan. 27, 2023) ("There is no doubt that felons fall within the scope of the other Amendments identified in *Heller* . . . .Because the *Heller* court unequivocally equated the scope of the Second Amendment right with the rights secured by these other Amendments, rights belonging to all Americans, the Court rejects the Government's argument that all felons are categorically outside the scope of the Second Amendment's text because they are not 'virtuous citizens.'"); *United States v. Hester*, No. 1:22-cr-20333, ECF No. 39 (S.D. Fla. Jan. 27, 2023) (concluding that felons are included in the Second Amendment's "of the people."); *Campiti v. Garland*, No. 3:22-CV-177, 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) (noting that because the plaintiff is "a citizen of . . . the United States," he belongs to our national community and is among "the people" whose rights are presumptively protected by these amendments to the Constitution, notwithstanding

his felony conviction); *United States v. Goins*, No. 5:22-CR-0009, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022) (observing that the Supreme Court's determination that law-abiding status is <u>sufficient</u> to qualify for protection does not imply that <u>only</u> law-abiding citizens hold rights under the Second Amendment); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D. W.Va. Oct. 12, 2022) ("The plain text of the Second Amendment does not include 'a qualification that Second Amendment rights belong only to individuals who have not violated any laws.'"); *United States v. Williams*, No. 1:21-cr-362, 2022 WL 18285005, at *2 (N.D. Ga. Nov. 14, 2022) (same); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022) ("Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.'"); *United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) ("[I]t is clear that convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments."); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (critiquing the government's constrained reading of "the people" protected by the Second Amendment and applying the presumption of consistent usage in declining to "carve out felons from the scope of the Second Amendment's protection of 'the people . . . .'").

The view that the Second Amendment covers the virtuous and unvirtuous alike finds support in the analysis of other §922 challenges as well. *See generally, United States*

*v. Alston,* No. 5:23-CR-00021, 2023 WL 4758734, at *7 (E.D.N.C. July 18, 2023)

(recommending dismissal of charges under 18 U.S.C. § 922(g)(3) and § 922(n) and

disagreeing with government's claim that Alston falls outside of the Second

Amendment's protection because of his status as an unlawful drug user under

indictment); *United States v. Bartucci*, No. 1:19-CR-00244, 2023 WL 2189530, at *6

(E.D. Cal. Feb. 23, 2023) (ultimately denying motion to dismiss, but finding persons

under indictment for a felony are "presumed innocent until proven guilty" therefore,

assumed  "law-abiding citizens" that fall within "the people" under the Second

Amendment, and noting alternatively that because "all people" have the right to keep

and bear arms, the Second Amendment protects Defendant as well); *United States v.*

*Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *2 (S.D. Ohio Feb. 21, 2023) (declining

to find §922(n) facially invalid, but acknowledging that it would be inconsistent with

the Amendment's plain text to exclude individuals under indictment from the "right

of the people to keep and bear arms."); *United States v. Stambaugh*, No. CR-22-00218-

PRW-2, 2022 WL 16936043, at *2 (W.D. Okla. Nov. 14, 2022) (casting doubt on the

United States' claim that a person under indictment for a felony is "exactly the kind of

non-law abiding, dangerous person that can be disarmed . . . ."; the *Stambaugh* court

noted that neither *Bruen* nor *Heller* explicitly or implicitly removes Second

Amendment protection from those "merely *accused* of a felony by a grand jury," and

who are otherwise presumed innocent); *Rowson*, *supra*, 2023 WL 431037, at *15-19

(noting that "[t]he holding urged by the Government, under which felony indictees

would be excluded altogether from 'the people' as used in the Second Amendment, would therefore be inconsistent with both the breadth of the term, and its symmetrical use across amendments, noted in *Heller*."); *Hicks, supra,* 2023 WL 164170 (dismissing indictment under § 922(n) and finding that the Second Amendment's right of "the people" does not rest solely with law-abiding, responsible citizens); *United States v. Reaves*, No. 4:22-cr-224-HEA, ECF No. 55 at 16 (E.D. Mo. Jan. 9, 2023) (recommending same). The concern with the government's expansive approach was laid bare by the majority opinion in *United States v. Rahimi*:

> Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans . . . ."

61 F.4th 443, 453 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).

This Court can confidently rely on the above-cited analysis and authority to conclude that, even as a person convicted of a violent felony and accused of current crimes, Mr. Williams remains part of "the People" entitled to Second Amendment protections.

## 2. Is the firearm at issue in this case is a "weapon[] 'in common use' today"?

**Yes.** The indictment accuses Mr. Williams of unlawfully possessing a handgun,

specifically a .9mm semi-automatic pistol. Consistent with *Heller* and *Bruen,* the parties agree that handguns are weapons commonly used today for lawful purposes, and therefore fall within the ambit of Second Amendment protection.  *See generally, Bruen*, 142 S. Ct. at 2143 (describing handguns as "the quintessential self-defense weapon," and concluding that "even if . . . colonial laws prohibited the carrying [them] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

**3. What is Defendant's conduct that the Second Amendment's "plain text" does or does not cover?** *See Bruen*, **142 S. Ct. at 2126. Why does the "plain text" of the Second Amendment cover (or not cover) that conduct?**

It cannot be overstated that the relevant focus under any Second Amendment analysis is on an individual's **conduct**, rather than any particular identity or status. Regardless of his criminal history and status as a parolee – or even the government's hyper-focus on his identity as an "unvirtuous" and non-law-abiding person, Mr. Williams remains one of "the People" in the eyes of the Constitution. *See, Answer to Question 1, supra.* He is an American citizen who has resided in the United States his entire life, and therefore belongs to the class of persons who form our national community and retain their Second Amendment rights.

The next analytical step under *Bruen* is to review the Constitutional text to decide if it presumptively protects the disputed conduct.  142 S.Ct. at 2130.  If it does,

the United States can then attempt to rebut the presumption with evidence from history and tradition.

Here, Mr. Williams is charged under §922(g)(1), which criminalizes the mere possession of a firearm. Like the petitioners seeking redress in *Bruen*, Mr. Williams' core concern lies in the need for armed self-defense outside the home, and the attendant right to carry arms in public for that purpose. *Bruen* at 2135 (noting that "[m]any Americans hazard greater danger outside the home than in it," and observing that "[a] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower.") (quoting *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012). The relevant conduct under consideration is therefore the basic possession of a firearm.

With its express reference to the act of "keep[ing]" and "bear[ing]" arms, the Second Amendment clearly protects this conduct. *Bruen*, 142 S.Ct. at 2134. By allegedly possessing the handgun at issue, Mr. Williams "kept" the weapon within the meaning of the Constitution. *See Heller*, 554 U.S. at 582-83 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons' . . . '[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else.*") (emphasis in original). Thus, despite the government's attempt at framing Mr. Williams' conduct in highly-specific terms (i.e. the possession of a stolen firearm, in a vehicle, while on parole, and while in possession of drugs), they have not prepared a charging document reflecting any of those facts. Rather, the core conduct

24

flagged in the indictment is exceedingly simple: the keeping and bearing of a weapon. Per *Bruen,* the Second Amendment's plain text applies to this behavior and thus presumptively guarantees Mr. Williams his right to do so for self-defense. *Bruen*, 142 S. Ct. at 2135.

## 4.  Why did Defendant have the firearm at issue in this case (for what purpose(s)?

Mr. Williams acknowledges that the Second Amendment right is not unlimited. *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). Yet, for reasons that are clear from the government's request for a hearing (presumably featuring testimony and evidence), Mr. Williams cannot make any representations in response to this particular question.

He simply would note that the only relevant inquiry under *Bruen* addresses (1) whether the Second Amendment's plain text covers an individual's conduct, and (2) whether the government's proffered restriction is consistent with the Nation's historical tradition of firearm regulation. *Bruen* at 2129-2130. And though Courts in *Bruen, Heller* and *McDonald,* all affirmed the individual right to keep and bear arms, inside and outside the home, for general self-defense, ultimately an individual's purpose is immaterial under the newly-announced *Bruen* standard.

25

**5. Is there a "societal problem" that § 922(g)(1) addresses?** *See Bruen*, **142 S. Ct. at 2131. If so, has this problem "persisted since the 18th century"?** *Id.* **Did "earlier generations address[] the societal problem . . . through materially different means"?** *Id.*

To determine whether a modern firearms law is unconstitutional, *Bruen* directs lower courts to proceed in two steps. The first task is to determine whether the Second Amendment applies. *Id.* at 2129–30. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126.

Once that inquiry is complete, the Court turns to deciding if a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. As has been noted, the government bears the burden of demonstrating a tradition supporting the challenged law. *Id.* at 2130. Only by showing that the law does not tread on the historical scope of the right can the government "justify its regulation." *Id.*

This latter step requires Court to carefully consider both history and analogical reasoning. Understanding that the "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated," *Bruen* dictates that the government identify a "tradition"—an established practice of limiting the right to bear arms, as evidenced by a comparable gun regulation.

The *Bruen* Court identified two separate frameworks for analyzing whether an older regulatory practice compares to a current gun regulation. As the Fifth Circuit

26

explained in *Daniels*, 77 F.4th at 341–42, *Bruen* helpfully gave us two conceptual

pathways:

> If the modern regulation addresses "a **general societal problem that has persisted since the 18th century**," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (quoting *Bruen* at 2131). But if a modern law addresses "**unprecedented societal concerns or dramatic technological changes**," a "more nuanced approach" is warranted and the Court must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law..

*Id.* at 342.

### a. Concerns about crime in densely-populated areas is a well-established societal problem that preceded the country's founding.

In its response, the Government appears to suggest that rather than addressing

a general societal problem that has persisted since the 1700s, § 922(g)(1) aims to curb

"unprecedented societal concerns" over mass-shootings, drive-by shootings, and the

availability of high-powered semi-automatic weapons with high-capacity magazines in

densely populated communities. (Gov't. Supp. Response at 34). In choosing this

construction, the government invites the Court to apply the less rigorous of the two

standards announced in *Bruen* for evaluating the quality of its proffered historical

analogues. The Court should decline to do so.

The societal problem addressed by §922(g)(1) is the reduction of crime

generally, as the government concedes. (Gov't. Supp. Response at 34). The

statute targets crime through a strategy of eliminating felons' access to firearms.

Surely broad issues of crime have posed problems for the national community since well before 1791.

Proof can be found with even a cursory view at history. For example, in St. George Tucker's 1803 annotations of William Blackstone's commentaries, Volume 5 - Chapter 14, there is a robust discussion about various crimes, ranging from misdemeanors to felonies, and identifying "public wrongs" of all sorts. The crimes examined include offenses against public justice; offenses against the person (e.g. mayhem, rape, robbery, kidnapping); offenses against the habitation of individuals (like burglary, arson, and breaking and entering); homicide (ranging from manslaughter to premeditated murder); offenses against property; high treason; heresy; felonies injurious to the King (e.g. embezzlement, desertion from the King's army, and service to foreign states); bigamy; riots; unlawful assemblies; and a host of other offenses.

Yet, the government's analysis glosses over this fact and wrongly suggests that the concerns targeted by §922(g)(1) were unknown during the founding era and in 18th century England. The defense submits that this is not an accurate read of the available history.

Because §922(g)(1) addresses "a general societal problem that has persisted since the 18th century," it is not enough for the government to point to a "relevantly similar" historical analogue in assessing the law's viability under the Second Amendment. Rather, *Bruen* requires proof of a "distinctly similar

28

historical regulation addressing [the] problem." In other words, §922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Id.*; *see United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *6 (W.D. Okla. Feb. 3, 2023) ("[T]he United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)—which *Bruen* suggests is dispositive."). Its inability to find one provides relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Unfortunately for the government, this is exactly the historical record that exists with regard to felon-disarmament laws.

**b. Given the sparse historical record of felon disarmament, it is evident that earlier generations dealt with the problem through materially different means.**

Historical scholars have not identified any eighteenth or nineteenth century laws forever depriving felons of the right to bear arms. *See generally, Kanter,* at 454 (Barrett, J., dissenting) ("[t]he best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."). Nor does the government identify any such authority here.

It cannot because no such laws historically exist. *See*, e.g., Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights*

*to the "Virtuous*," 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) (noting felon-disarmament laws did not emerge until "the early part of the twentieth century"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun*?, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same). See also *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 914-15 (3d Cir. 2020) (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons").

At the risk of being redundant: "Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451(Barrett, J., dissenting).

Given the paucity of a distinctly similar analogue, the Court is duty-bound to closely follow *Bruen*'s reasoning and hold the government to its heavy burden to justify the regulation.

In an effort to save the statute, the government points to an inapposite historical record hoping to affirmatively prove that the law set forth in §922(g)(1) is part of the historical tradition that "delimits the outer bounds of the right to keep and bear arms," per *Bruen. Id.* at 2127. Over the course of several pages, it cites several founding-era laws which treated felons harshly, noting that both death and land loss

30

were commonplace punishments for felons in the late 18th century and served as "the standard penalty for all serious crimes." (Gov't. Supp. Response at 34-41). And it is true that at common law, one <u>did</u> forfeit personal property ("goods and chattels") upon conviction for any "of the higher kinds of offense" like treason, "felonies of all sorts . . . self-murder or felony *de se*, petit larceny," and others. Marshall, 32 Harv. J.L. & Pub. Pol'y at 714–15.

But as multiple commentators have noted, the mere fact of forfeiting land and property upon conviction would not necessarily mean a person was barred from acquiring *new* property – including guns. *Id.* The opposite is true. A felon could retain the freedom to purchase arms after successfully completing a sentence and reintegrating into society. *Range,* 69 F.4th 96, at 127–28 (Krause, J., dissenting); *See also,* Act of Apr. 5, 1790, § 2 (1790), 13 Statutes at Large of Pennsylvania 511, 511–12 (Wm. Stanley Ray ed., 1908) (providing that every person convicted of robbery, burglary, sodomy, and similar crimes "shall forfeit to the commonwealth all ... goods and chattels whereof he or she was seized or possessed at the time the crime was committed and at any time afterwards **until** conviction," but saying nothing about restrictions on owning property after conviction or service of the sentence). Regarding the relevance of founding-era punishment with death, the *en banc* Court noted in *Range*:

> That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and

tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed.

*Range*, 69 F.4th at 105. The government's argument otherwise fails to persuade.

The United States also points to several categories of historical evidence that are inadequate to answer the question and are not sufficient similar to the regulation at issue here.  First, it relies on the late 17th-century tradition in England of disarming Papists / Roman Catholics who refused to renounce their faith. (Gov't. Supp. Response at 9-11). These laws came after a period of significant political and religious turmoil where the English government, during Reformation, broke away from the Catholic Church and replaced it with leaders who were aligned with the Protestant Church of England.

Before that transition of power, there were constant struggles between England's Catholic Kings and its Parliament, often driven by Anti-Catholic sentiment and concerns about whether the King would assert his views on the country. Tensions culminated in 1688-1689, which resulted in (1) the ousting of King James II, a Roman Catholic, (2) assumption of the monarchy by King William III of Orange, a Protestant, and (2) an English Parliament that asserted dominance over the monarchy, limited the King's powers, and identified protections for English subjects.

The new day was marked by the issuance of the English Declaration in 1689, which included a right to bear arms reserved only for Protestant subjects. *See* An Act

declaring the Rights and Liberties of the Subject and Setleing the Succession of the Crowne, 1 W. & M., Sess. 2, c. 2, § 1 (1688) (Eng.) (Declaring "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law."). These laws, however, were not about punishing lawbreakers generally. They were targeted at Roman Catholics, who – after the Protestants' ascension to the throne – were presumptively deemed treasonous for aligning themselves with a prior monarchy.

Far from merely addressing concerns about whether Catholics "would abide by the law," (Gov't. Supp. Response at 11), these restrictions were designed to strip potentially seditious rivals of power and to prevent armed insurrection against the Crown. Marshall, *supra* at 723 ("the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king."); *An Act for the better secureing the Government by disarming Papists and reputed Papists*, 1 W. & M., Sess. 1, c. 15, § 4 (1688) (Eng.) ("And **for the better secur[]ing their Majestyes Persons and Government** Be[] it further enacted and declared That no[] Papist or reputed Papist so[] refus[]ing . . . shall or may have or keep[] in his House or elsewhere or in the Possession of any other person to his use or at his disposition any Arms Weapons Gunpowder or Ammunition . . . .) (emphasis added). As one scholar put it, is true that England had established a well-practiced tradition of disarming people deemed "dangerous," "violent" and "disaffected." But the aim was not to

33

focus on persons who presented ordinary risks of danger: "While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions. The early Americans adopted much of that tradition in the colonies." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 261 (2020).

Significantly, the government's discussion about 17th-Century Catholic disarmament omits arguably the most important part of analysis, which is that the restriction was not at all absolute. The Act's text makes clear that notwithstanding the restriction, a Roman Catholic could "have or keep[] . . . such necessary Weapons . . . **for the defence of his House or person**." *Id.* To escape the arms disability, the person needed only appear at the justice of the peace and take an oath swearing allegiance to the king. Marshall, *supra* at 723. In that respect, it could not be more different than §922(g)(1). That the Papist disarmament law contains this escape hatch undercuts, rather than supports, the government's claim that lawmakers in founding era contemplated absolute and permanent bans on arms possession for an entire class of people.

The same can be said of the government's lengthy discussion about attempts during the Revolutionary war, and before then, in two American colonies – Massachusetts and Virginia – to disarm "outspoken" people (like religious leader and early feminist Anne Hutchinson) who refused to declare their loyalty to the government. (Gov't. Supp. Response at 13-17). Again, it identifies **groups that were**

(purportedly) disarmed on account of their "disavowal of the rule of law," including Catholics, nonconformist Protestants, and even "free, Christian, white men," who refused to swear loyalty or show appropriate levels of faithfulness to the colonies. It extrapolated from them a broader principle: that the Second Amendment, as understood in 1791, did not protect *any* group (or almost any group) that disrespected the law, even if that specific group was never disarmed at the founding. The question, however, is not whether categories of people *could* be disarmed by the government historically. Clearly, the answer to that would be "yes." The relevant question is whether there was a regulatory scheme distinctly similar to § 922(g)(1) that permitted the disarmament of felons. And the answer to that, quite clearly, is a resounding "no."

Lastly, the government repeats the commonly-made argument that debates from the Ratification Conventions of Pennsylvania, Massachusetts, and New Hampshire all support a limitation on who could lawfully bear arms. Pennsylvania's proposals came the closest, guaranteeing a right to bear arms "unless for crimes committed." *D.C. v. Heller*, 554 U.S. 570, 658 (2008) (describing rejected Pennsylvania proposal). It also cites two others: the Samuel Adams proposal from Massachusetts, which would restrict the right to "peaceable citizens," and the New Hampshire convention, which would allow the disarmament of citizens who either are or have been in "actual rebellion." (Gov. Supp. Response at 17-20) (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971)).  In response to this point, the perspective of the *Rahimi* court is instructive.

35

> "While the[se] were influential proposals, neither became part of the Second Amendment as ratified. Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue . . . because, *inter alia*, they were not enacted."

*United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (citing *Bruen*) ("[T]o the extent later history contradicts what the text [of the Second Amendment] says, the text controls.").

### c. The Court should reject the government's efforts to define the relevant historical tradition at a high level of generality.

The government's analysis here is not surprising. In previous *Bruen* litigation, the government has similarly argued that § 922(g)(1) is constitutional because it fits within a supposed historical tradition permitting legislatures to take firearms away from "dangerous" or "unvirtuous" people, or people who demonstrated "disrespect for the law." As it does here, the government seeks to support this argument by citing founding-era laws disarming enslaved Africans, Native Americans, certain religious minorities, and citizens who refused to swear a loyalty oath to the state. Based on these disparate regulations of discrete groups, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group whom a legislature might rationally deem "dangerous" or "unvirtuous," even if that specific group (such as felons) was never disarmed at the founding.

This argument operates at too high a level of generality. *Bruen* demonstrates

that in carving out exceptions to "the Second Amendment's unqualified command," *id.* at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely, to ensure they are in fact consistent with America's historical tradition of firearm regulation.

To support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138. New York could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

*First,* New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to colonial and early-republic statutes prohibiting similar conduct. *Id.* at

37

2142-46. According to New York, these regulations demonstrated a "sweeping" governmental power to restrict public carry. *Id.* at 2139. But the Court read the regulations as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2145. And because those regulations prohibited only one particular manner of public carry, *id.* at 2143, they did not establish that the Second Amendment "permit[s] *broad* prohibitions on *all* forms of public carry," *id.* at 2145 (emphasis added).

*Second,* New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. New York argued these statutes demonstrated that states may "ban public carry altogether." *Id.* But again, the Court refused to endorse such a far-reaching reading of the historical record. State courts interpreting those statutes had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original). And the *Bruen* Court declined to conclude, based on the permissibility of restricting one "particular mode" of public carry (concealed), that states may enact a "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id.* at 2146-47 & n.19 (emphasis added).

*Third,* New York analogized its proper-cause requirement to mid-19th-century "surety statutes." *Id.* at 2148. Those statutes provided that if someone carried a firearm in public and thereby placed others in reasonable fear of injury,

38

he would have to "post a bond before publicly carrying a firearm" again, unless he could show he had "reasonable cause to fear an assault or other injury." *Id.* The Court rejected the comparison. Under surety statutes, "everyone started out with robust carrying rights and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 2149. New York's regime, by contrast, "presume[d] that individuals have *no* public carry right without a showing of heightened need." *Id.* at 2148 (emphasis in original). From the fact that states may "provide financial incentives for responsible" public carry, the Court refused to conclude that other, historically unprecedented public-carry restrictions are permissible. *See id.* at 2150.

And the Court held that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry. The Court's historical survey revealed a few "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.* at 2138. But that's all. New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly. *Accord, Harrison*, 2023 WL 1771138, at *19 n.134 (holding government cannot use this "trick" to disarm "whole new classes of people" who "aren't remotely the sort of persons that were historically regulated"); *Range*, 69 F.4th at 105 ("That Founding-

era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be 'far too broad.'" (quoting *Bruen*, 142 S. Ct. at 2134)); *cf. United States v. Power*, No. 20-PO-331, 2023 WL 131050, at *10 (D. Md. Jan. 9, 2023) ("As the Supreme Court cautioned, '[e]verything is similar in infinite ways to everything else.' So, the Court must avoid finding that analogies are 'relevantly similar' where the connection is overly superficial or general." (quoting *Bruen*, 142 S. Ct. at 2132)).

In addition, the Second Amendment exceptions that this approach would produce are grossly overbroad. Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined." *Bruen*, 142 S. Ct. at 2156. Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the right to keep and bear arms. *Id.* at 2134; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter* at 465 (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun."). These terms not only lack a "*clear* limiting principle," they lack any limiting principle at all. *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out broad new category of speech unprotected by the First Amendment)

40

(emphasis added); *see also Bruen*, 142 S. Ct. at 2130 (analogizing Second Amendment to First Amendment).

To defend § 922(g)(1), the government cannot rely on unbounded descriptors like "dangerous" and "disrespect for the law." Instead, it must descend into particulars.

**6. Why should the Court deny Defendant's motion based on *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010), as the government requests (see ECF No. 16, PageID.67–69), given that the Sixth Circuit in *Carey* did not undertake the type of analysis now required by *Bruen*?**

While the Sixth Circuit has not yet addressed a direct challenge to §922(g)(1) after *Bruen,* in an earlier as-applied challenge to another provision of §922(g), the Sixth Circuit declined to follow *Heller*'s statement regarding the presumptive legality of bans on possession by the mentally ill. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 686-87 (6th Cir. 2016) (en banc) ("We do not take *Heller*'s 'presumptively lawful' dictum to foreclose §922(g)(4) from constitutional scrutiny.").

In *Tyler*, the Sixth Circuit concluded that

> *Heller*'s analytical structure and its conclusions command resort to historical evidence in determining the scope of the Second Amendment. . . In the absence of [historical] evidence, it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right based on a past involuntary commitment.

*Id.* at 687. *Tyler* warned that "*Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Id.* at 686.

41

While *Tyler* did not implicate §922(g)(1), the opinion noted the Sixth Circuit relied on *Heller's* "presumptively lawful" dictum in *United States v. Carey. See Tyler* at 688 (referencing *Carey*, 602 F.3d 738, 740-41 (6th Cir. 2010)). However, *Carey* predates *Bruen,* and the court's former willingness to rely on the "presumptively lawful" dictum from *Heller* is no longer instructive.  Quite the opposite, *Bruen's* renewed demand for courts to do a deep historical analysis now stands directly at odds with the logical shortcut created by the "presumptively lawful" dictum of *Heller.* 142 S. Ct. 2111.

In other words, *Carey* should no longer control because the intervening change in law has made its reliance on *Heller*'s dicta impermissible. Under *Bruen*, courts are recognizing that the extent of the Second Amendment's protections should not be determined by statements made in a case where criminal history was not at issue. *See e.g., Atkinson, supra* at 1022-23 (remanding to district court for historical analysis); *Range*, 69 F.4th at 101; *Bullock*, 2023 WL 4232309 at *19. As discussed above, *Bruen*'s requirement that courts analyze the historical tradition of gun regulation means it would be troubling to continue applying dicta that even the *Heller* Court acknowledged was not based on an extensive historical inquiry. 554 U.S. at 626.

Instead, this Court should join the growing number of courts, outside this district and circuit, that have rejected this approach and instead worked to interpret the historical record presented by the government. *See e.g. Range,* 69 F.4th at 104-06 (interpreting historical record of disarming individuals convicted of non-violent felonies); *Bullock*, 2023 WL 4232309 at *30 (interpreting historical record of disarming

felons); *Hicks,* 2023 WL 164170 at \*4,\*6-\*8 (interpreting historical record of disarming individuals under indictment); *Harrison, supra,* 2023 WL 1771138 at \*1 (interpreting record disarming formerly intoxicated people).

Faced with a similar tension between *Bruen* and prior circuit precedent in *United States v. Rahimi,* the 5th Circuit correctly opined that "*Bruen* clearly 'fundamentally change[d]' our analysis of laws that implicate the Second Amendment . . . rendering our prior precedent obsolete." *Rahimi*, 61 F.4th at 450–51. Because the *Carey* court uncritically accepted the superficial analysis of felon disbarment as articulated in *Heller*, this Court should not use it to avoid the *Bruen* question.

It is worth noting that both the Supreme Court and other federal courts have recognized district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority. *See, e.g., Rivers v. Roadway Express*, Inc., 511 U.S. 298, 312 (1994) (noting that "[e]ven though applicable Sixth Circuit precedents were otherwise when this dispute arose, the District Court properly applied [supervening Supreme Court precedent] to this case," and further reasoning that "it is [the Supreme Court's] responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law."); *United States v. Egenberger*, 424 F.3d 803, 805 (8th Cir. 2005) ("The district court does not continue to be bound by prior interpretations of the law that are contrary to the Supreme Court's most recent announcement."); *Lee v. United States*, 570 F.Supp.2d 142, 149–50 (D.D.C. 2008) ("[W]hen holdings of the Supreme Court and the D.C.

Circuit are irreconcilable, the Supreme Court's decision will trump every time.").

Consistent with this obligation, the Court should follow *Bruen's* recent guidance on

how to interpret the Second Amendment and hold the government to its burden to

establish an appropriate historical analogue to § 922(g)(1).

7. **What, if anything, did Judge Carlton W. Reeves get wrong in his order granting the defendant's motion to dismiss in** *United States v. Bullock*, **No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023)?**

The defense believes the *Bullock* court was faithful to the admonition from

*Bruen* that Courts must meaningfully require the government to accept its burden for

properly defending firearm regulations. In holding that §922(g)(1) was

unconstitutional as applied to a defendant with a prior manslaughter conviction,

*Bullock*, 2023 WL 4232409 at *1, the Court properly endorsed both *Heller's* and *Range's*

broad definition of "the people" who enjoy Second Amendment protection. The

defense agrees with the *Bullock* court's finding that the term includes felons as

members of the "national community." *Id.* at *20-21.

As the *Bullock* Court noted, *Heller's* own pronouncement that felon-in-

possession laws are "presumptively lawful" strongly implies that this standard cannot

be applied unthinkingly.  It forecast a moment when the presumption would be tested

by a challenge to a firearm regulation. *Bullock*, 2023 WL 4232309 at *19 ("*Heller*

instead reassured us that 'there will be time enough to expound upon the historical

justification for the exceptions we have mentioned if and when those exceptions

44

come before us.'") (citation omitted). For the *Bullock* court, like the court in *Range* "[a]fter *Bruen*, that time has arrived." 2023 WL 4232309 at *19.

Respectfully, the defense disagrees with the government's characterization of the *Bullock* opinion as "poorly reasoned." To the contrary, a growing number of courts have adopted the *exact* analytical approach undertaken by Judge Reeves. Specifically, many courts resist the government's bold pronouncement that felons are not part of "the People," and that the Second-Amendment should apply **only** to law-abiding, responsible, virtuous citizens. *See Answer to Question 1, supra.*

Rather than brushing past the nuance of these issues, the *Bullock* court took great care over seventy-seven (77) pages to (1) digest *Heller, McDonald, Bruen* and their origins, (2) evaluate dozens of district and circuit opinions, (3) press beyond the alluring draw of Supreme Court dicta, (4) wrestle with murky historical records, and (5) draw guidance from the analytically-similar decision in *Range* to reach a thoughtful and well-supported outcome.

Thus, in answering what (if anything) Judge Reeves got wrong in his order, the defense respectfully says *nothing.*

## Conclusion

For the reasons stated cumulatively in all prior briefing on this issue, Mr. Williams asks the Court to dismiss the indictment as a violation of his rights as applied to him under the Second Amendment.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**
**EASTERN DISTRICT OF MICHIGAN**

s/Brandy Y. Robinson
BRANDY Y. ROBINSON (P66895)
Attorney for Ronald Williams
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5852
E-mail:  brandy_robinson@fd.org

Dated:  October 13, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2023, I electronically filed the above
document with the Clerk of the Court using the CMECF filing system, which
will send notification of the filing to opposing counsel of record.

/s/ Brandy Y. Robinson