## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

United States of America,

                Plaintiff,      Case No. 23-cr-20201

v.                        Judith E. Levy
                              United States District Judge

Ronald Norvale Williams,

                        Mag. Judge David R. Grand

                Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT [13]

Before the Court is a motion to dismiss the indictment filed by Defendant Ronald Norvale Williams. (ECF No. 13.) On November 9, 2023, the Court held a hearing and heard oral argument. For the reasons set forth below, Defendant's motion is GRANTED.

### I.    Background

A one-count indictment filed on April 4, 2023 charges Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1] (ECF No. 1.) The indictment alleges that

_____

[1] Section 922(g)(1) states:

[o]n or about March 2, 2023, in the Eastern District of Michigan, Southern Division, the defendant, Ronald Williams, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed, in and affecting interstate commerce, a firearm, that is a Hi-Point C9 nine-millimeter semi-automatic pistol, in violation of Title 18, United States Code, Section 922(g)(1).

(*Id.* at PageID.1.) Defendant pled not guilty on April 13, 2023.

On June 15, 2023, Defendant filed a motion to dismiss the indictment. (ECF No. 13.) Defendant argues that § 922(g)(1)—which imposes "[a] total prohibition on firearm possession by felons"—violates his right to keep and bear arms under the Second Amendment to the United States Constitution.[2] (*Id.* at PageID.40.) Defendant seeks

---

It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

[2] In his motion to dismiss, Defendant indicates that

[t]he felonies underlying [ ]his [§ 922(g)(1)] charge stem from his 1987 convictions for first and second-degree murder arising from a single incident. Because [Defendant] was 17 at the time of the killings, he was eventually resentenced from the original penalty of non-parolable

2

dismissal of the indictment "[u]nder the new framework mandated by [*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)]." (ECF No. 13, PageID.30.) The government responded to Defendant's motion. (ECF No. 16.) The Court then ordered the parties to submit supplemental briefing (ECF No. 17), and the parties complied. (ECF Nos. 18, 19, 22.) In his first supplemental brief, Defendant "clarif[ies] that his *Bruen* motion challenges the constitutionality of 18 U.S.C. § 922(g)(1) as applied to him."[3] (ECF No. 18, PageID.94.)

## II.   Legal Standard

### A. Federal Rule of Criminal Procedure 12(b)(1)

Under Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

---

life to a term of 25-60 years, based on *Miller v. Alabama*, 567 U.S. 460 (2012). [Defendant] was on parole from this sentence at the time he allegedly possessed the gun at issue in the current case.

(ECF No. 13, PageID.33; *see* ECF No. 18, PageID.95.)

[3] During the hearing on this motion, Defendant made an oral motion for the Court to also consider a facial challenge to § 922(g)(1). The Court will consider Defendant's as-applied challenge at this time. Therefore, Defendant's oral motion is denied.

## B. The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court determined that "the Second Amendment conferred an individual right to keep and bear arms" in the home for self-defense. 554 U.S. 570, 595, 628–30, 636 (2008). In reaching this conclusion, the Court pointed out that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court indicated that it "d[id] not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" but that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other firearm restrictions.[4] *Id.* The Court referred to these restrictions—including prohibitions that apply to felons—as "presumptively lawful regulatory measures." *Id.* at 627

---

[4] The other firearm restrictions mentioned in *Heller* are "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

In *McDonald v. Chicago*, the Supreme Court subsequently held that the Second Amendment right to keep and bear arms in the home for self-defense "is fully applicable to the States" through the Fourteenth Amendment. 561 U.S. 742, 750 (2010); *see id.* at 791 ("We . . . hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*.").

More recently, the Supreme Court held in *Bruen* that "consistent with *Heller* and *McDonald*, . . . the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. The Court indicated that, as in *Heller*, it "d[id] not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 31 (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Supreme Court addressed the framework that applies to a Second Amendment claim. The Court noted that "[i]n the years since" it decided *Heller* and *McDonald*, "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second

5

Amendment challenges that combines history with means-end scrutiny." *Id.* at 17. The Supreme Court, however, "decline[d] to adopt that two-part approach" in *Bruen.*[5] *Id.* The Court stated that

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg*, 366 U.S. at 50, n.10, 81 S. Ct. 997.

*Id.* at 24.

Under *Bruen*, "the government *must affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (emphasis added). "To carry its burden, the Government must point to 'historical

---

[5] In *Bruen*, the Supreme Court found that

> [s]tep one of the predominant [two-step] framework [adopted by appellate courts] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022); *see id.* at 24 ("[T]he Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.").

precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.'" *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir.) (alteration in original) (quoting *Bruen*, 597 U.S. at 27), *cert. granted*, 143 S. Ct. 2688 (2023).

"The test that [the Supreme Court] set forth in *Heller* and appl[ied] [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. The historical analysis hinges on the societal problem that the challenged regulation addresses:

> In some cases, th[e] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 26–27.

At the same time, the Court recognized that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. In considering "modern regulations that were unimaginable at the founding," courts must conduct a historical inquiry that "often involve[s] reasoning by analogy." *Id.* at 28. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29 (internal citation omitted). The Supreme Court instructs that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*'" considerations when engaging in an analogical inquiry." *Id.* at 29 (emphasis in original) (quoting *McDonald*, 561 U.S. at 767). Further,

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand,

8

analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 30 (emphasis in original).

## III.  Analysis

Defendant argues that the indictment, which charges him with a violation of § 922(g)(1), should be dismissed under *Bruen*. He argues that his conduct comes within the plain text of the Second Amendment and is presumptively protected by the Constitution. (ECF No. 13, PageID.30, 33.) He asserts that "[t]he government will be unable to rebut that presumption" with the necessary historical support. (*Id.*) In its response, the government argues that Defendant's challenge to § 922(g)(1) fails due to *Heller*'s "presumptively lawful" language and due to pre-*Bruen* Sixth Circuit precedent. (ECF No. 16, PageID.59–62.) The government also argues that Defendant's conduct is not protected by the Second Amendment and that "categorical disarmament of all convicted felons is consistent with the historical tradition of firearms regulation in this nation." (*Id.* at PageID.60–62.)

9

The Court begins its analysis by addressing the government's argument that consideration of Defendant's motion starts and ends with *Heller* and existing Sixth Circuit precedent. The Court concludes that Defendant's motion cannot be resolved under that case law and that the Court must apply the framework articulated in *Bruen*. The Court then applies that framework and finds that (1) Defendant's conduct is covered by the plain text of the Second Amendment and is therefore presumptively protected by the Constitution, and (2) the government fails to demonstrate that § 922(g)(1) is consistent with the nation's historical tradition of firearm regulation.

## A. *Heller* and the Sixth Circuit's Pre-*Bruen* Precedent Do Not Resolve Defendant's Motion

As noted, the government argues that Defendant's motion should be denied because of *Heller*'s "presumptively lawful" language and because of Sixth Circuit precedent. (*Id.* at PageID.59–60.) In the government's view, "*Bruen* did not overrule any part of *Heller*" (*id.* at PageID.66; ECF No. 19, PageID.137), and "nothing in *Bruen* undermined *Heller's* conclusions that longstanding prohibitions on felon armament are presumptively valid." (ECF No. 16, PageID.60; *see id.* at PageID.65, 68.) The government indicates that "six Justices in *Bruen*

stated [in a concurring or dissenting opinion] that longstanding prohibitions on the possession of firearms by felons remain presumptively lawful under *Heller*." (*Id.* at PageID.66–68 (discussing concurring and dissenting opinions in *Bruen* that addressed *Heller*[6]); *see id.* at PageID.63; ECF No. 19, PageID.139 ("As pointed out by the concurring and dissenting [J]ustices, nothing in *Bruen* undercuts the presumptive validity of felon-in-possession prohibitions.").)

---

[6] With respect to the concurring and dissenting opinions in *Bruen*, the government states that

> Justice Alito noted that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). And Justice Kavanaugh, joined by Chief Justice Roberts, emphasized that "the Second Amendment allows a 'variety' of gun regulations," reiterating *Heller's* assurances about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J. and Roberts, C.J., concurring). These three concurring justices provided integral votes for the majority opinion. And three other dissenting Justices voiced the same opinion. *Id.* at 2189 ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller's* holding"—*i.e.*, that prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places, or laws imposing conditions and qualifications on the commercial sale of arms are presumptively lawful) (Breyer, J., dissenting, joined by Sotomayor, J. and Kagan, J.).

(ECF No. 16, PageID.66–67 (alterations in original).)

The government also argues that the Court is bound by *United States v. Carey*, a case that pre-dates *Bruen* in which "the Sixth Circuit held that § 922(g)(1) was presumptively valid under *Heller* alone."[7] (ECF No. 16, PageID.67 (citing *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010)); ECF No. 19, PageID.137–139.) The government argues that "*Bruen* does not jeopardize *Carey's* holding on § 922(g)(1), because *Carey* did not rely on means-end scrutiny." (ECF No. 16, PageID.68; ECF No. 19, PageID.139.) The government argues that "the type of historical analysis articulated in *Bruen*" is "unnecessary here because of controlling Sixth Circuit precedent in *Carey*." (ECF No. 16, PageID.61.) According to the government, "*Carey* is binding until the Sixth Circuit says otherwise." (ECF No. 19, PageID.137.)

The Court is unpersuaded by the government's arguments on how to resolve Defendant's constitutional challenge to § 922(g)(1). As of the date of this opinion and order, the Supreme Court and the Sixth Circuit

---

[7] In *United States v. Carey*, the Sixth Circuit concluded that "Congress's prohibition on felon possession of firearms is constitutional," 602 F.3d 738, 741 (6th Cir. 2010), based on *Heller*'s language that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* (quoting *Heller*, 554 U.S. at 626). The Sixth Circuit noted that "[a]fter *Heller*, this Court affirmed that prohibitions on felon possession of firearms do not violate the Second Amendment." *Id.* (citing *United States v. Frazier*, 314 F. App'x 801 (6th Cir. Nov. 19, 2008)).

have not issued a decision on a post-*Bruen* constitutional challenge to that statute. *See United States v. Bowers*, No. 22-6095, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024) ("No binding case law addresses the constitutionality of § 922(g)(1) in light of *Bruen* . . . . Neither the Supreme Court nor the Sixth Circuit has yet to address the issue."). But there is a pre-*Bruen* decision from when the Sixth Circuit was sitting en banc that the Court finds instructive: *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) (en banc).[8]

In *Tyler*, the Sixth Circuit considered a plaintiff's as-applied challenge to 18 U.S.C. § 922(g)(4). That portion of § 922 prohibits the possession of a firearm by a person "who has been adjudicated as a mental defective or who has been committed to a mental institution." *Tyler*, 837 F.3d at 681 (quoting 18 U.S.C. § 922(g)(4)). The *Tyler* court found that *Heller*'s "presumptively lawful" language regarding "longstanding prohibitions on the possession of firearms by felons and the mentally ill" did not resolve the question of § 922(g)(4)'s constitutionality as applied to the plaintiff. *Id.* at 686 (quoting *Heller*, 554 U.S. at 595, 626, 627 n.26). The Sixth Circuit stated:

---

[8] *Tyler* was decided in September 2016—almost six years after the Sixth Circuit's April 2010 decision was issued in *Carey*.

While we "are obligated to follow Supreme Court dicta," *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted), *Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis. A presumption implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny in challenge to § 922(g)(1)); *Chester I*, 628 F.3d at 679 ("[T]he phrase 'presumptively lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'" (quoting *Williams*, 616 F.3d at 692)). We do not take *Heller*'s "presumptively lawful" dictum to foreclose § 922(g)(4) from constitutional scrutiny. The mere fact that Congress created a categorical ban does not give the government a free pass; it must still be shown that the presumption applies in the instant case. *See Williams*, 616 F.3d at 692.

*Id.* at 686–87 (footnotes omitted); *see id.* at 681 ("Unlike the district court, we do not understand *Heller*'s pronouncement about presumptively lawful prohibitions to insulate § 922(g)(4) from constitutional scrutiny nor do we believe that on the record as it currently stands the government has carried its burden . . . ."); *see also United States v. Harrison*, 654 F. Supp. 3d 1191, 1204 (W.D. Okla. 2023) (concluding that *Heller*'s assertion on "longstanding prohibitions

on the possession of firearms by felons" is "hardly an endorsement of any and all such prohibitions dreamed up by modern legislatures. And even then, the Court did not place an absolute stamp of approval on such prohibitions: those prohibitions are merely 'presumptively lawful,' implying that some could be unconstitutional in some circumstances." (footnotes omitted) (quoting *Heller*, 554 U.S. at 626, 627 n.6)); *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("I agree with the majority that *Heller*'s dictum does not settle the question before us[: whether felon dispossession statutes, including § 922(g)(1), violate the Second Amendment as applied to the plaintiff].").

In light of the guidance provided by the Sixth Circuit in *Tyler*, the Court finds that *Heller*'s "presumptively lawful" dicta does not definitively answer the question of whether § 922(g)(1) is constitutional as applied to Defendant. To address this issue, the Court must conduct a constitutional analysis. According to the Supreme Court, the proper way to conduct that analysis is using the framework required by *Bruen*.[9] *See Bruen*, 597 U.S. at 24 (instructing courts to implement a

---

[9] This Court is bound by the majority opinion in *Bruen* and its instructions to apply the framework discussed above. Therefore, the Court will not decide Defendant's motion based on the views on *Heller* expressed by the Justices in

15

"standard for applying the Second Amendment" that considers text and history). Thus, the Court rejects the government's argument that the Court should deny Defendant's motion entirely under *Heller* and *Carey*—without applying the test articulated in *Bruen*. (*See* ECF No. 16, PageID.67–69; ECF No. 19, PageID.137–139.)

---

*Bruen*'s concurring and dissenting opinions, which are not binding authority. *See United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) (declining to resolve a *Bruen* motion to dismiss a § 922(g)(1) charge by "tally[ing] the felon-in-possession votes implied by *Bruen*'s concurrences and dissent" because "this Court cannot honor an advisory opinion on an issue that was not before the Supreme Court. And it is no substitute for applying the new legal standard announced in *Bruen*. Believing it to be insufficient, then, this Court will refrain from counting the Justices' votes today."); *Am. Tel. & Tel. Co. v. Commc'n Workers of Am., AFL-CIO*, 985 F.2d 855, 859 (6th Cir. 1993) (indicating that a Supreme Court Justice's concurrence "is not binding precedent"); *Palmer v. Schuette*, No. 14-14820, 2016 WL 5477260, at *4 (E.D. Mich. Sept. 29, 2016) ("[A]s this language is from a concurring opinion, it is not binding . . . ."); *United States v. Peters*, No. 6:17-CR-55-REW-HAI-2, 2018 WL 6313534, at *4 n.12 (E.D. Ky. Dec. 3, 2018) ("Concurrences are not, when accompanying a majority opinion, binding precedent." (citing *Alexander v. Sandoval*, 121 S. Ct. 1511, 1519 (2001); *Rice v. Great Seneca Fin. Corp.*, Nos. 2:04–cv–0951, 2:04–cv–972, 2010 WL 2541626, at *5 (S.D. Ohio June 18, 2010), *objections overruled*, Nos. 2:04–cv–0951, 2:04–cv–972, 2010 WL 3910308 (S.D. Ohio Oct. 5, 2010))); *Pleasant View Baptist Church v. Beshear*, 838 F. App'x 936, 941 n.4 (6th Cir. 2020) (A Supreme Court Justice's "dissent to the contrary is not binding law."); *Sanders v. Wayne State Univ.*, No. 22-12025, 2023 WL 6035570, at *3 (E.D. Mich. Aug. 9, 2023) ("A dissenting opinion is not binding on this Court."), *report and recommendation adopted*, No. 22-cv-12025, 2024 WL 340812 (E.D. Mich. Jan. 30, 2024); *United States v. Jahns*, No. 3:10 CR 435, 2012 WL 928725, at *6 (N.D. Ohio Mar. 19, 2012) ("The district court is bound by precedent of the Sixth Circuit and the United States Supreme Court. Dissenting Supreme Court opinions are not binding precedent." (internal citation omitted)), *opinion clarified*, No. 3:10 CR 435, 2012 WL 1196144 (N.D. Ohio Apr. 10, 2012).

16

The Court, therefore, evaluates whether Defendant's challenge to § 922(g)(1) succeeds under the *Bruen* framework, which includes assessing—at a later point—whether the government has met its burden under that framework. *See Bruen*, 597 U.S. at 19, 24; *Tyler*, 837 F.3d at 687 ("The mere fact that Congress created a categorical ban does not give the government a free pass; it must still be shown that the [*Heller*] presumption applies in the instant case." (internal citation omitted)).

## B. The Second Amendment's Plain Text Covers Defendant's Conduct, so His Conduct is Presumptively Protected by the Constitution

Applying *Bruen*, the Court first examines whether the Second Amendment's plain text covers Defendant's conduct. A district court in the Sixth Circuit has stated that "[t]his preliminary analysis asks three questions. Is [the defendant] one of the people whom the Second Amendment protects? . . . Is the weapon that [the defendant] carried in common use today? . . . Last, does the plain text of the Second Amendment protect [the defendant's] specific conduct?" *United States v. Goins*, 647 F. Supp. 3d 538, 544 (E.D. Ky. 2022) (citing *Bruen*, 597 U.S. at 31–32); *see United States v. Slone*, No. 5:22-CR-144-KKC-MAS, 2023

17

WL 8037044, at *2 (E.D. Ky. Nov. 20, 2023) (asking the three questions listed above to analyze "*Bruen's* first step" involving the Second Amendment's plain text (citing *Goins*, 647 F. Supp. at 544)). Here, the parties agree that the firearm in this case is a weapon in common use today. (ECF No. 19, PageID.126; ECF No. 22, PageID.202–203.) But the parties disagree on (1) whether Defendant is part of "the people" as that term appears in the Second Amendment, and (2) whether Defendant's specific conduct is protected by the plain text of the Second Amendment. As set forth below, the Court finds that Defendant is one of "the people" and that the Second Amendment's plain text covers his conduct.

> i.    *Defendant is Part of "The People" in the Second Amendment*

Defendant argues that the plain text of the Second Amendment covers his conduct because he is part of "the people" as that term is used in the amendment. Defendant asserts that the Second Amendment does not draw a distinction between felons and non-felons. (ECF No. 13, PageID.41.) He states that "the people" "unambiguously refers to *all* members of the political community, *not an unspecified subset*." (*Id.* (emphasis in original) (quoting *Heller*, 554 U.S. at 580; citing *Range v.*

*Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc)); ECF No. 22, PageID.196.) Defendant further states that "[t]he Second Amendment right—like the rights of 'the people' in other amendments—'is exercised individually and belongs to *all* Americans.'" (ECF No. 13, PageID.41 (emphasis in original) (quoting *Heller*, 554 U.S. at 580); ECF No. 22, PageID.196.) Defendant notes that "the people" appears in other parts of the Constitution (in addition to the Second Amendment): the Constitution's Preamble,[10] the First Amendment,[11] the Fourth Amendment,[12] the Ninth Amendment,[13] and the Tenth Amendment.[14]

---

[10] The Constitution's Preamble states: "WE THE PEOPLE of the United States, in Order to form a more perfect Union . . . do ordain and establish this CONSTITUTION for the United States of America." U.S. Const. pmbl.

[11] The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

[12] The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.

[13] The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.

(ECF No. 22, PageID.195–196.) Defendant indicates that "[c]ourts have . . . hesitated to interpret 'the People' in a manner that is artificially narrow and inconsistent with its usage in other parts of the Constitution." (*Id.* at PageID.196.)

In response, the government argues that Defendant's conduct is not covered by the text and history[15] of the Second Amendment because "the Second Amendment's scope is limited to law-abiding citizens who may possess firearms for lawful purposes." (ECF No. 16, PageID.62, 69.) The government asserts that "'[t]he people' whose rights the Second Amendment protects are law abiding, responsible members of the American polity, not felons." (*Id.* at PageID.70 (citing *Heller*, 554 U.S. at 635); ECF No. 19, PageID.119, 122.) The government argues that because Defendant is a convicted felon, he "is excluded from the class of

---

[14] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

[15] Regarding any reference to history made by the government in arguing that the Second Amendment does not protect Defendant's conduct, "*Bruen* makes clear that the first step is one based solely on the text of the Second Amendment to determine if it presumptively protects an individual's conduct—a presumption that the United States can *then* rebut with history and tradition." *United States v. Harrison*, 654 F. Supp. 3d 1191, 1198 (W.D. Okla. 2023) (emphasis in original).

ordinary, responsible, law-abiding citizens whose rights the Second Amendment protects."[16] (ECF No. 16, PageID.61.)

_____

[16] The government provides additional reasons in its supplemental brief as to why it believes that Defendant is not a "law-abiding" person. Defendant was on parole during the charged offense, and the government states that his violation of the condition of his parole prohibiting the possession of firearms "further demonstrates that he is not a 'law-abiding' person." (ECF No. 19, PageID.127.) In the government's view, "Defendant was [also] not a 'law-abiding person' when he carried a pistol in 2023" because he violated state and/or federal law by (1) "carr[ying] a pistol in his vehicle without a license," (2) "possess[ing] the gun in connection with a drug crime," and (3) "possess[ing] and transport[ing] . . . a stolen firearm." (*Id.* at PageID.128–129.) But the government does not show that these details necessarily exclude Defendant from "the people." To the extent it is appropriate for the Court to consider this information (including any alleged conduct not charged in the indictment, *see infra* at 33–37), the Court finds that the information does not alter the Court's analysis and ultimate conclusions. The Court agrees with Defendant that "[r]egardless of his criminal history and status as a parolee," Defendant "remains one of 'the People' in the eyes of the Constitution." (ECF No. 22, PageID.203.) Defendant's parole violation and his possible violations of state and/or federal law potentially go to whether he is a law-abiding individual. But because the Court finds below that "the people" is not limited to only those who are "law-abiding," the details the government presents do not establish that Defendant is not part of "the people."

Moreover, the Court notes that other courts facing a *Bruen* challenge to § 922(g)(1) have found a defendant to be part of "the people" despite the defendant having possessed the firearm while on state or federal supervision. *See United States v. Lanier*, No. 22-469, 2023 WL 8255101, at *1 n.3, *3 (E.D. Pa. Nov. 29, 2023) ("[D]espite his prior convictions, Defendant"—who was on parole when charged with violating § 922(g)(1)—"is 'one of the people' protected by the Second Amendment."); *United States v. Hairston*, No. 3:23-cr-00020-SVN, 2024 WL 326667, at *1, *5 (D. Conn. Jan. 29, 2024) ("There is no basis to find that felons are . . . not part of the 'political community' for purposes of the Second Amendment. The Court thus finds that the Second Amendment's plain text presumptively protects . . . [the] right to bear arms" of the defendant, who was apparently on probation at the time of the § 922(g)(1) offense.); *United States v. Hawkes*, No. 22-111-GBW, 2023 WL 8433758, at *4, *4 n.1 (D. Del. Dec. 5, 2023) (The defendant, who was "subject to the

The government argues that "'the people' does not mean [ ]'all Americans.'[ ] *Heller* . . . makes clear that the Second Amendment's protections are limited to those who are 'members of the political

terms of probation at the time of his gun possession," "is a 'person' protected under the Second Amendment '[d]espite his criminal history.'" (alteration in original) (internal citation omitted)); *United States v. Cooper*, No. 23-004, 2023 WL 8186074, at *4–5, *5 n.2 (D. Del. Nov. 27, 2023) (The defendant, who was "subject to the terms of state probation at the time of his gun possession," "is a 'person' protected under the Second Amendment '[d]espite his criminal history.'" (alteration in original) (internal citation omitted)); *United States v. Taylor*, No. 23-cr-40001-SMY, 2024 WL 245557, at *1 n.1, *4 (S.D. Ill. Jan. 22, 2024) ("It is evident that [the defendant, who was on supervised release when he was arrested for being a felon in possession of a firearm under § 922(g)(1),] is included in 'the people' covered by the Second Amendment, and that his conduct is presumptively protected."); *United States v. Calhoun*, No. 22-cr-00025, 2024 WL 36977, at *1, *8 (N.D. Ill. Jan. 3, 2024) ("agree[ing] with [the defendant] that felons are not categorically excluded from the plain textual scope of the Second Amendment" in a case in which the defendant was on probation when he was charged with violating § 922(g)(1)); *United States v. Jackson*, No. 21-cr-00175, 2023 WL 8601498, at *1, *7 (N.D. Ill. Dec. 12, 2023) ("agree[ing] with [the defendant] that felons are not categorically excluded from the plain textual scope of the Second Amendment" in a case in which the defendant was on parole when he was arrested for a § 922(g)(1) offense); *United States v. Delaney*, No. 22 CR 463, 2023 WL 7325932, at *1, *5 (N.D. Ill. Nov. 7, 2023) (concluding—in a case in which the defendant was on supervised release when he possessed a firearm in violation of § 922(g)(1)—"that the government has not met its burden to prove that felons are excluded from 'the people' whose firearm possession is presumptively protected by the plain text of the Second Amendment"); *United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *1, *5 (N.D. Ill. Oct. 3, 2023) (finding "no reason to think that the word 'people' does not cover, on its face, all persons—including a person convicted of a felony"—in a case in which the defendant was on parole at the time of his arrest for a § 922(g)(1) charge). In those cases, the violation of the terms of supervision was not explicitly considered in the analysis concluding that the defendant was among "the people" under the Second Amendment. Thus, such a violation by an individual does not require a finding that the individual is not part of "the people."

22

community' and 'law-abiding, responsible citizens.'" (ECF No. 19, PageID.122.) The government asserts that "[l]egislatures have historically had wide latitude to exclude felons from the political community."[17] (*Id.* at PageID.119.) The government also states that "[i]n *Bruen*, the Supreme Court confirmed—explicitly and repeatedly— that the right to keep and bear arms belongs only to ordinary, law-abiding citizens. . . . Indeed, the *Bruen* Court described the holders of Second Amendment rights as *law-abiding* citizens no fewer than fourteen times." (ECF No. 16, PageID.71–72 (emphasis in original) (internal citations omitted).)

In addition, the government asserts that "the people" in the Second Amendment does not need to have the same meaning as "the people" in the First and Fourth Amendments—two amendments that "undisputedly protect even those who have been excluded from 'the

---

[17] The government states that "[f]elons . . . could historically be excluded from exercis[ing] the elective franchise, . . . as well as from other, closely related political rights—including the rights to hold public office, to serve on juries, and, most relevant here, the right to bear arms." (ECF No. 19, PageID.120 (internal quotation marks and citations omitted).) The government adds that "today it remains the case that [t]he commission of a felony often results in the lifelong forfeiture of a number of rights tied to membership in the political community, including the right to serve on a jury and the fundamental right to vote." (*Id.* (alteration in original) (internal quotation marks and citation omitted).)

political community' because of felony convictions." (ECF No. 19, PageID.125.) Presumably referencing *Heller*'s "longstanding prohibitions" language, 554 U.S. at 626, the government argues that "*Heller* indicates that even those who are protected by other provisions of the Bill of Rights—including 'felons and the mentally ill,' . . . — nevertheless can be disarmed consistent with the Second Amendment." (ECF No. 19, PageID.125 (quoting *Heller*, 554 U.S. at 626).)

The Court is not persuaded by the government's arguments. The government does not show that "the people" in the Second Amendment refers only to law-abiding citizens. Nothing in the plain text of the Second Amendment imposes this limitation or creates a distinction involving felons. *See United States v. Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *3 (N.D. Ill. Oct. 12, 2023) ("There is no reason in the text of the Constitution to think that the phrase 'the people' does not cover, on its face, all persons—including a person convicted of a felony."). As Defendant points out in considering the Second Amendment's text, "the people" is a term that appears in additional parts of the Constitution. (ECF No. 22, PageID.195–196.) The Supreme Court determined in *Heller* that "in all six other provisions of the

Constitution that mention 'the people,'[18] the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The Court also found "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. The Court later concluded in *Bruen* that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581).

In this case, the government does not overcome the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. In *Heller* and *Bruen*, the Supreme Court references law-abiding citizens; however, those cases did not definitively conclude that felons are excluded from the protections of the Second Amendment and that the protections apply exclusively to law-abiding citizens. *See Goins*, 647 F. Supp. 3d at 545 ("[T]he Supreme Court's determination that law-abiding status is

---

[18] The Supreme Court considered the five references to "the people" listed above, *see supra* at 19, as well as a reference to "the people" in "§ 2 of Article I (providing that 'the people' will choose members of the House)." *Heller*, 554 U.S. at 579.

sufficient to qualify for protection does not imply that only law-abiding citizens hold rights under the Second Amendment."); *United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *4 (N.D. Ill. Oct. 3, 2023) ("The bottom line is that *Heller*'s and *Bruen*'s repeated references to 'law-abiding citizens' do not establish the proposition that the Supreme Court has already answered whether the [Second] Amendment's plain text covers firearms possession by felons." (internal citations omitted)). Instead, *Heller* stated that "longstanding prohibitions" on firearm possession by felons are "presumptively lawful," 554 U.S. at 627 n.26—a presumption that can be rebutted—and *Bruen* "decide[d] nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." 597 U.S. at 72 (Alito, J., concurring). In fact,

> neither *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people. Put another way, the Court did not hold in either case that non-law-abiding felons were outside the scope of the Second Amendment's plain text.

*United States v. Calhoun*, No. 22-cr-00025, 2024 WL 36977, at *7 (N.D. Ill. Jan. 3, 2024) (emphasis in original). *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) ("The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion [regarding felons] is unclear."); *Goins*, 647 F. Supp. 3d at 545 ("The issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court" in *Bruen*.); *United States v. Edwards*, No. 5:23-cr-200-MHH-HNJ, 2023 WL 8113789, at *3 (N.D. Ala. Nov. 22, 2023) ("The *Bruen* court did not consider the right of a felon to carry firearms." (internal citations omitted)); *Range*, 69 F.4th at 101 ("[T]he criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were dicta. And while we heed that phrase, we are careful not to overread it . . . ."); *United States v. EtchisonBrown*, No. 22-10892, 2023 WL 7381451, at *3 (5th Cir. Nov. 7, 2023) ("[T]he constitutionality of § 922(g)(1) *after Bruen* is not clear or obvious." (emphasis in original)).

The government also fails to demonstrate that Defendant is not part of "the political community" on the basis that felons may lose certain "political rights" or "rights tied to membership in the political community," such as the right to hold public office, serve on a jury, and vote. (ECF No. 19, PageID.119.) *See supra* note 17. At a minimum, the government does not show that Defendant was deprived of the right to vote when he was arrested for the § 922(g)(1) charge.[19] Nor does the government establish that losing one or more of these rights excludes an individual from "the political community" or from being one of "the people" covered by the Second Amendment. Even if an individual was

---

[19] As a parolee, Defendant was eligible to vote in Michigan at the time of his arrest. *People v. Roebuck*, No. 279555, 2008 WL 1914893, at *1 n.1 (Mich. Ct. App. May 1, 2008) ("[A] convicted felon who is not confined for a felony conviction at the time of an election, e.g., a person who has completed a felony prison sentence or even a person on probation or parole for a felony, is eligible to vote in Michigan." (citing Mich. Comp. Laws § 168.758b)); *see also* Mich. Comp. Laws § 168.758b (prohibiting a person from voting "while confined" in jail or prison); Mich. Comp. Laws § 168.492a (providing that "[a]n individual who is confined in a jail and who is otherwise a qualified elector may, before trial or sentence, register to vote" and that "[a]n individual who is confined in a jail after being convicted and sentenced is not eligible to register to vote"); Mich. Const. art. 2, § 2 (allowing the legislature to "exclude persons from voting because of . . . commitment to a jail or penal institution"); *You can vote - Returning Citizens Version*, https://www.michigan.gov/-/media/Project/Websites/sos/34lawens/You_Can_Vote_Returning_Citizens_Version.pdf (last visited Feb. 21, 2024) ("If you have a past conviction, **you can vote**. If you are on parole, **you can vote**. If you are on probation, **you can vote**." (emphasis in original)).

deprived of all three political rights, the individual is arguably still part of "the political community" because they retain their First Amendment right of freedom of speech to discuss political matters.[20] The government acknowledges that a person with a felony conviction maintains the protections of the First Amendment. (*See* ECF No. 19, PageID.125.) Thus, any argument by the government that Defendant is not one of "the people" because he is not a member of "the political community" lacks merit.

Moreover, this Court does not find it appropriate to interpret "the people" in the Second Amendment differently than, or inconsistent with, how that term is understood in other parts of the Constitution. Such an interpretation would be at odds with *Heller*. *See Range*, 69 F.4th at 102 ("[T]he Supreme Court in *Heller* suggested" that "the meaning of the phrase 'the people' [does not] var[y] from provision to provision," and "we see no reason to adopt an inconsistent reading of 'the people.'"); *Goins*, 647 F. Supp. 3d at 547 ("Treating some groups as

---

[20] The Supreme Court has previously drawn comparisons between the Second Amendment and the First Amendment. In *Bruen*, the Supreme Court noted that its "Second Amendment standard accords with how we protect other constitutional rights," such as "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Bruen*, 597 U.S. at 24 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–35)).

not part of the people protected under the Second Amendment is . . . inconsistent with *Heller*," in which the Court "determined that the Second Amendment's use of 'the people' is consistent with the other six provisions of the Constitution that reference 'the people.'" (citing *Heller*, 554 U.S. at 580)); *Calhoun*, 2024 WL 36977, at *8 ("Since felons are not excluded from First or Fourth Amendment rights, neither should they be excluded from Second Amendment rights, given the Framer's [sic] consistent use of the term 'the people' throughout." (internal citation omitted)).

For these reasons, Defendant is part of "the people" in the Second Amendment.

> ii. *Defendant's Alleged Conduct—Possession of a Firearm—is Covered by the Second Amendment's Plain Text*

As noted, the parties dispute whether Defendant's specific conduct is protected by the plain text of the Second Amendment. In its order requiring supplemental briefing, the Court asked the parties to identify the conduct at issue and Defendant's purpose for having the firearm.[21]

---

[21] In *Bruen*, the petitioners' "proposed course of conduct" was "carrying handguns publicly for self-defense." 597 U.S. at 32. The Supreme Court therefore appeared to consider the petitioners' conduct and the purpose for their conduct.

(ECF No. 17, PageID.90.) In their responsive filings, the parties define Defendant's conduct differently and suggest diverging approaches for considering why Defendant had the firearm.

The government indicates in its supplemental brief that Defendant's conduct was:

- possessing a firearm, Appendix, pp 11-12b, 14b;

- while on parole, *id.* at 7-8b;

- knowing it was stolen, *id.* at 15b (revealing the gun to be stolen) and 16b (Defendant denying knowledge of the gun's origin);

- while concealing it in a motor vehicle, *id.* at 11-12b, 14b;

- while possessing 23.8 grams of cocaine and a methamphetamine pill, *id.* at 11b, 14b, 21b.

(ECF No. 19, PageID.126–127.) The government states that

> [i]n the event the Court determines that his *purpose* in possessing a firearm is relevant to adjudicating the instant motion, the Court should make a factual determination at an evidentiary hearing. As an offer of proof, it appears Defendant's purpose in carrying the pistol was to protect his stash of 23 grams of cocaine while he transported it on the Lodge Freeway, presumably to customers. . . .

(*Id.* at PageID.129 (emphasis in original).)

In his subsequent filing, Defendant indicates that "[t]he relevant conduct under consideration is . . . the basic possession of a firearm," given that he "is charged under §922(g)(1), which criminalizes the mere possession of a firearm." (ECF No. 22, PageID.204.) He states that "[l]ike the petitioners seeking redress in *Bruen*, [his] core concern lies in the need for armed self-defense outside the home, and the attendant right to carry arms in public for that purpose." (*Id.* (citing *Bruen*, 597 U.S. at 33).) He asserts that he "'kept' the weapon within the meaning of the Constitution" in light of the Second Amendment's "express reference to the act of 'keep[ing]' and 'bear[ing]' arms." (*Id.* (alterations in original) (internal citations omitted).) Defendant takes issue with "the government's attempt at framing [his] conduct in highly-specific terms (i.e. the possession of a stolen firearm, in a vehicle, while on parole, and while in possession of drugs)" because the government has "not prepared a charging document reflecting any of those facts." (*Id.*)

In his filing and during the hearing on Defendant's motion, Defendant declined to indicate for what purpose he had the firearm because he wished to preserve his right to be presumed innocent and to avoid making factual representations on the record that could

compromise that right. (*Id.* at PageID.205 ("[F]or reasons that are clear from the government's request for a hearing (presumably featuring testimony and evidence), [Defendant] cannot make any representations in response to this particular question.").) Defendant states that "ultimately an individual's purpose is immaterial under the newly-announced *Bruen* standard." (*Id.*)

The Court limits its consideration of Defendant's conduct to the facts alleged in the indictment in recognition of the current status of his criminal case and out of respect for his rights. The Court assumes the alleged facts to be true "[f]or the limited purpose of adjudicating [Defendant's] motion." *United States v. Posey*, 655 F. Supp. 3d 762, 765 (N.D. Ind. 2023). The Court "reiterate[s] that Defendant remains presumed innocent of the charge[ ] against h[im], and the Court takes no position on the question of h[is] guilt, or the veracity of any factual allegation presented by the Government." *Id.* In this portion of its analysis, the Court thus considers Defendant's conduct to be possession of a firearm (without considering the purpose for which he had the firearm). That conduct is protected by the Second Amendment's plain

text guaranteeing the right "to keep and bear Arms." U.S. Const. amend. II.

The Court's assessment of Defendant's conduct is consistent with *United States v. Harper*, a different criminal case in which the defendant challenged § 922(g)(1) based on *Bruen*. *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023). In *Harper*, the court found that the defendant's conduct as alleged in the indictment (possession of a firearm) was covered by the Second Amendment's plain text. The court did not require the defendant to identify the purpose for which he had the firearm because of considerations that apply to a criminal case. The court stated:

> In *Bruen* and *Range*, the plaintiffs' proposed conduct was readily apparent because they filed lawsuits to allow them to engage in the conduct at issue. In a criminal case, a different approach is required. . . .
>
> * * *
>
> The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon. Other than to address a Second Amendment challenge, there is no reason to require a defendant accused of illegal possession of a firearm pursuant to Section 922(g) to state his purpose for possessing the firearm. That is because the circumstances surrounding the possession do not impact the elements of

34

the offense. In other words, even if [the defendant] asserted that he possessed the firearm for the purpose of self-defense, he would still stand accused of violating Section 922(g)(1) because the possession of a firearm for any purpose is a criminal act based on his status as a convicted felon. Thus, even assuming the defendant could make a representation about his purpose in possessing a firearm without that representation being deemed an admission, the purpose for making such a representation is limited to this Second Amendment context. It is not clear that the *Bruen* or *Range* decisions would require an assertion of purpose in the criminal context. Thus, this court will not require this assertion of purpose without clear direction from the Third Circuit or the Supreme Court.

Rather, as suggested by [the defendant], the court will accept the conduct alleged in the indictment as true for purposes of making this determination. [The defendant's] possession of a firearm is conduct covered by the plain text of the Second Amendment: "[T]he right of the people to keep and bear Arms, shall not be infringed." *See Bullock*, —— F.Supp.3d at ——, 2023 WL 4232309 at \*28 (holding that the plain text of the Second Amendment covers Mr. Bullock's conduct, which was "possession of ordinary firearms in the home").

*Id.* at \*8–9 (last alteration in original).

Like the court in *Harper*, this Court will only consider the conduct alleged in the indictment to determine whether Defendant's conduct is covered by the Second Amendment's text; the Court will not require Defendant to specify the purpose for which he had the firearm without

35

the Sixth Circuit or the Supreme Court instructing otherwise. Because the Court limits this portion of its analysis to a review of the facts alleged in the indictment, the Court does not consider the details presented by the government that are absent from the indictment, such as that Defendant was on parole,[22] that the gun was stolen, and that Defendant was in possession of certain drugs. For the reasons set forth

---

[22] During the hearing on Defendant's motion to dismiss, Defendant's attorney indicated that it is permissible for the Court to consider in this as-applied challenge that Defendant was on parole "as part of distinguishing why he would be able to carry as compared to someone else." Even if the Court were to consider that Defendant was on state parole at the time of the charged offense, the Court agrees with the court in *Harper* that this detail does not demonstrate whether a defendant's conduct is covered by the Second Amendment. Any argument that Defendant's conduct is not entitled to Second Amendment protection because he did not lawfully possess the firearm due to him being on parole

> puts the cart before the horse. That [Defendant] may lawfully be stripped of a firearm does not prove that he did not have a Second Amendment right to possess the firearm to begin with. *See Range*, 69 F.4th at 102 (citing *Binderup*, 836 F.3d at 344; *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)). In other words, the fact that [Defendant] may have violated the conditions of his state parole by possessing the firearm—as well as allegedly violating federal law by possessing the firearm due to his status as a convicted felon—does not answer the question of whether his conduct of possessing the firearm is covered by the Second Amendment.

*United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *9 (M.D. Pa. Sept. 1, 2023). *But see United States v. Terry*, No. 2:20-CR-43, 2023 WL 6049551, at *4 (W.D. Pa. Sept. 14, 2023) ("[A]pplication of § 922(g) necessarily couldn't regulate any protected Second Amendment activity by Defendants at the time they possessed the firearms at issue" because they were on state supervision.).

above, Defendant's conduct as alleged in the indictment—possession of a firearm—is covered by the plain text of the Second Amendment. *See id.* at *9.

In sum, the Court concludes that Defendant is part of "the people" and that the Second Amendment's plain text covers his conduct. His conduct is presumptively protected by the Constitution, so the Court evaluates whether the government "justif[ies]" § 922(g)(1) "by demonstrating that [the statute] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

### C. The Government Fails to Demonstrate that § 922(g)(1) is Consistent with the Nation's Historical Tradition of Firearm Regulation

Because Defendant's conduct is presumptively protected by the Constitution, the government must demonstrate that § 922(g)(1)'s lifetime prohibition on the possession of firearms by felons "is consistent with the Nation's historical tradition of firearm regulation." *Id.* As set forth below, the Court concludes that the government fails to make this showing.

i.   *The Standard for Analyzing Historical Tradition Under* Bruen

The Supreme Court instructs courts assessing a Second Amendment claim to consider the "historical tradition" from when the Second Amendment was ratified in 1791. *See id.* at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35)). Therefore, "greater weight attaches to laws nearer in time to the Second Amendment's ratification." *Rahimi*, 61 F.4th at 456.

In reviewing the relevant historical tradition, the Court is "not obliged to sift the historical materials for evidence to sustain [the challenged] statute. That is [the government's] burden." *Bruen*, 597 U.S. at 60. The Supreme Court noted in *Bruen* that "'[i]n our adversarial system of adjudication, we follow the principle of party presentation.' *United States v. Sineneng-Smith*, 590 U.S. ——, ——, 140 S. Ct. 1575, 1579, 206 L.Ed.2d 866 (2020). Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6.

Under *Bruen*, a court determining whether a statute

38

> is consistent with our tradition of gun regulation . . . must first ask a methodological question: What kind of similarity are we looking for? "Distinct" similarity or a less precise "relevant" similarity? *See Bruen*, 142 S. Ct. at 2131–32. That depends on whether § 922(g)([1]) "addresses a general societal problem that has persisted since the 18th century" or an "unprecedented societal concern[ ]" that the Founding generation did not experience. *Id.* at 2131–32.

*United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) (last alteration in original). "Distinct" similarity applies to a persistent problem, and "relevant" similarity applies to an unprecedented problem. *See United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *2 (N.D. Ill. Nov. 2, 2023) (discussing the "two avenues of historical inquiry" established by "[t]he *Bruen* Court").

In this case, the government's arguments regarding the general societal problem at issue and the applicable standard are unclear. The government states in its supplemental brief that "[t]he societal problem that [§ 922(g)(1)] address[es] is crime, specifically violent crime." (ECF No. 19, PageID.130.) The government recognizes in its written submission—and it acknowledged during the hearing—that "guns and criminals" (including felons) "existed at the time of the Second Amendment's ratification." (*Id.*; *see id.* at PageID.98.) But in its

supplemental brief, the government references the following "novel societal problems" as well: "[t]he types and power of firearms, the population density, and the accessibility of firearms to dangerous people." (*Id.* at PageID.130.) During the hearing, the government identified an additional societal problem: preventing gun violence by individuals who are not predisposed to follow the law or who lack the capacity to follow the law. The government did not specify whether this problem is old or new. The government later argued that "it" is "an age old problem that has continued to evolve."

As for the applicable standard, the government does not clearly conduct a "distinctly similar" or "relevantly similar" analysis in its briefing. During the hearing, the government argued that the applicable standard is "relevantly similar," and it may have also argued that either the "distinctly similar" or "relevantly similar" standard applies— or possibly that both standards apply.

Defendant's arguments in his second supplemental brief are more straightforward. He argues that "[t]he societal problem addressed by §922(g)(1) is the reduction of crime, generally, as the government concedes." (ECF No. 22, PageID.207 (citing ECF No. 19, PageID.130).)

Defendant argues that the "distinctly similar" standard applies because § 922(g)(1) "targets crime" and "[s]urely broad issues of crime have posed problems for the national community since well before 1791." (*Id.* at PageID.207–209.)

As indicated during the hearing on Defendant's motion to dismiss, the Court finds that the societal problem that § 922(g)(1) addresses is crime.[23] *See* 18 U.S.C. § 922(q)(1)(A) ("The Congress finds and declares that . . . crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem[.]"). Crime is an age-old problem that existed in the eighteenth century. As a result, the government must demonstrate that there is a historical tradition of firearm regulation that satisfies the "distinctly similar" standard in *Bruen*. The government, however, "has not identified a single historical law that is 'distinctly similar' to § 922(g)([1])—which *Bruen* [potentially] suggests is dispositive." *Harrison*, 654 F. Supp. 3d at 1199 (citing *Bruen*, 597 U.S. at 26–27); *but see Calhoun*, 2024 WL 36977, at *9–10 ("Even in the

---

[23] The government argued during the hearing that instead of focusing on whether the "specific harm [is] the harm that existed in 1791, the question really has to be is the principal [sic] that is in play, the scope, the magnitude, and the tools available to remedy the harm, are those things that the Founders could have invoked and chose not to?" The Court declines to take this approach, given that the government's proposed inquiry is absent from the *Bruen* test.

straightforward case, the absence of distinctly similar historical regulation is merely '*relevant* evidence' of unconstitutionality, not dispositive evidence," and "and does not obviate the analogical inquiry described in *Bruen*." (emphasis in original) (quoting *Bruen*, 597 U.S. at 26; citing *United States v. Phillips*, 2023 WL 9001124, at *12 (N.D. Ill. Dec. 28, 2023))). Regardless of the position that the government takes, its historical evidence falls short under both standards ("distinctly similar" and "relevantly similar"), as discussed below.[24]

### ii.   *The Government Does Not Show "Distinct Similarity"*

The government does not meet its burden under *Bruen*'s "distinctly similar" standard. If "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must identify "a distinctly similar historical regulation addressing that problem." *Bruen*, 597 U.S. at 26. In this case, the government does not identify such a regulation. "There is no evidence

---

[24] Because the Court is "entitled to decide a case based on the historical record compiled by the parties," *Bruen*, 597 U.S. at 25 n.6, the Court "resolve[s Defendant's] motion to dismiss based on the parties' presentations in their briefs." *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *3 n.2 (M.D. Pa. Sept. 1, 2023). Moreover, Defendant does not take issue with the accuracy of the government's historical sources. Therefore, unless otherwise noted, the Court decides Defendant's motion based on the information in the parties' briefs.

[in the record] of any law categorically restricting individuals with felony convictions from possessing firearms at the time of the Founding or ratification of the Second or Fourteenth Amendments." *Prince*, 2023 WL 7220127, at *6; *see Daniels*, 77 F.4th at 344 ("[W]hen the [ratifying] public experienced the harm the modern-day regulation attempts to address," courts "could count [historical] silence"—or the absence in the historical record of "regulations of a particular kind"—"as evidence that the public did not approve of such a regulation." (citing *Bruen*, 597 U.S. at 26–27)).

In a different case, then-Judge Barrett determined that "[f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). She concluded that "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Id.* at 464 (Barrett, J., dissenting); *see id.* at 458 (Barrett, J., dissenting) ("[N]either the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons."). Regarding the

43

enactment of felon dispossession laws, a court in the Northern District of Illinois has stated that

> the first federal statute disqualifying certain violent felons from firearm possession was not enacted until the Federal Firearms Act in 1938, which was 147 years after the ratification of the Second Amendment and 70 years after the ratification of the Fourteenth Amendment. <u>See</u> Pub. L. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). Congress did not enact a lifetime ban on firearm possession by all felons until 1961. Pub. L. 87-342, 75 Stat. 757 (1961); <u>see</u> <u>also</u> 18 U.S.C. § 922(g)(1).

*Prince*, 2023 WL 7220127, at *6.

Here, the government points to no historical regulation disarming felons that dates back to when the Second Amendment was ratified. Accordingly, the government does not identify a historical regulation that is "distinctly similar" to § 922(g)(1).

### iii. The Government Does Not Show "Relevant Similarity"

To the extent *Bruen*'s "relevantly similar" standard applies in this case, the government does not satisfy its burden under that standard either. "To sustain § 922(g)([1])'s burden on [Defendant's] Second Amendment right, the Government bears the burden of proffering 'relevantly similar' historical regulations that imposed 'a comparable

burden on the right of armed self-defense' that were also 'comparably justified.'" *Rahimi*, 61 F.4th at 455 (quoting *Bruen*, 597 U.S. at 29). The government bears a heavy burden, especially because "the burden [imposed by the federal felon dispossession statute] is severe: it is a *permanent* disqualification from the exercise of a fundamental right." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) (emphasis in original) (internal citations omitted). "The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right." *Rahimi*, 61 F.4th at 454 (emphasis in original) (citing *Bruen*, 597 U.S. at 29).

In its supplemental brief, the government discusses two types of historical regulations: (1) laws that "categorically disqualif[ied] people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact" (ECF No. 19, PageID.104–105 (internal citation omitted)), and (2) laws that authorized capital punishment and forfeiture of estate as punishment

for certain felonies.[25] The Court "separately analyzes the burdens of and justifications for each type of historical regulation to determine whether § 922(g)(1) imposes a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Prince*, 2023 WL 7220127, at *6. For the reasons set forth below, the government does not show "relevant similarity" through the laws it identifies in these two categories of historical regulations.

>   a.   *Historical   Regulations   that   Disarmed "Untrustworthy" Individuals*

The government's discussion of historical regulations that disarmed individuals deemed "untrustworthy" addresses aspects of English legal tradition, colonial America, the Revolutionary War, and the ratification debates.

---

[25] In its supplemental brief, the government does not clearly indicate how the historical regulations involving capital punishment and forfeiture relate to the *Bruen* framework. (*See* ECF No. 19, PageID.130–137.) The Court presumes that the government is arguing that those regulations satisfy *Bruen*'s "relevantly similar" standard based on the Court's review of a supplemental brief submitted by the government in a different criminal case before this Court in which the defendant is also asserting a *Bruen* challenge to § 922(g)(1) in a motion to dismiss the indictment. (*See United States v. Raphael Jermaine Williams, Jr.*, Case No. 23-cr-20199, ECF No. 35.) In that case, the section of the government's supplemental brief that addresses capital punishment and forfeiture ends with a reference to the "relevantly similar" standard. (*See id.* at PageID.671–680.)

Beginning with English legal tradition, the government argues that it was "well-established" that the English government had "the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law."[26] (ECF No. 19, PageID.105.) In 1689, the English government passed a law that provided that "any Catholic who refused to make a declaration renouncing his or her faith" could not have or keep arms, weapons, gunpowder, or ammunition—except for weapons allowed "by Order of

---

[26] The Court does not disagree with the government that "English legal tradition sheds light on the scope of the right secured by the Second Amendment," given that the Second Amendment "codified a right inherited from our English ancestors." (ECF No. 19, PageID.105 (internal quotation marks omitted) (citing *Bruen*, 597 at 19–22).) *See Bruen*, 597 U.S. at 39 ("Respondents' substantial reliance on English history and custom before the founding makes some sense given our statement in *Heller* that the Second Amendment 'codified a right "inherited from our English ancestors."'" (quoting *Heller*, 554 U.S. at 599; citing *Smith v. Alabama*, 124 U.S. 465, 478 (1888))). But this Court is mindful that the Supreme Court

> has long cautioned that the English common law "is not to be taken in all respects to be that of America." *Van Ness v. Pacard*, 2 Pet. 137, 144, 27 U.S. 137, 7 L.Ed. 374 (1829) (Story, J., for the Court) . . . . Thus, "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*," not as they existed in the Middle Ages. *Ex parte Grossman*, 267 U.S. 87, 108–109, 45 S. Ct. 332, 69 L.Ed. 527 (1925) (emphasis added); see also *United States v. Reid*, 12 How. 361, 363, 13 L.Ed. 1023 (1852).

*Bruen*, 597 U.S. at 39.

the Justices of the Peace . . . [necessary] for the defence [sic] of his house or person." (*Id.* at PageID.105–106 (quoting 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688)).) The law also "provided that anyone who decided to make the declaration after having previously refused would regain the ability to keep and bear arms." (*Id.* at PageID.106–107 (citing 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 72 (1688)).) The law "reflected the new [Protestant] government's perception that Catholics who refused to renounce their faith" would disrespect and disobey English law. (*Id.* at PageID.106 (citing *Range v. Att'y Gen.*, 53 F.4th 262, 275 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023), *and on reh'g en banc sub nom. Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023)).) The restriction was not based on the belief that all Catholics were violent; rather, "the statute made clear that its concern was with propensity to disobey the sovereign." (*Id.* (citing *Range*, 53 F.4th at 275).)

The same Parliament that wrote the 1689 law wrote the following language into the 1689 English Bill of Rights: "Protestants may have Arms for their Defence [sic] suitable to their Conditions and as allowed

by Law." (*Id.* at PageID.107 (quoting 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688)).) This clause in the English Bill of Rights is the predecessor to the Second Amendment, and it is the first time the English formally "claimed the right of the individual to arms." (*Id.* (citing *Bruen*, 597 U.S. at 44–45).) The government indicates that in asserting this right, "the English ensured that the [English] government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the members of that class had failed to demonstrate that they would abide by the law, whether or not they had previously exhibited violence." (*Id.*)

Proceeding to colonial America, the government states that "[t]he American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy." (*Id.*) During this period, "[f]irearm regulations directed toward disarming Native Americans and Black people were pervasive."[27] (*Id.* at PageID.107–108.) In addition, "members of the

---

[27] In support of its statement regarding the "disarm[ament] of Native Americans and Black people," the government cites to the following sources:

See Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g., Laws*

political community as it then existed—i.e., free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." (*Id.* at PageID.109 (quoting *Range*, 53 F.4th at 276).)

In the 1630s, Massachusetts disarmed supporters of an outspoken preacher "because of their 'disavowal of the rule of law' and failure to

---

*and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

(ECF No. 19, PageID.107–108, 108–109 n.2.)

demonstrate 'obedience to the commands of the government'"—"not because those supporters had demonstrated a propensity for violence." (*Id.* (quoting *Range*, 53 F.4th at 276).) And during the French and Indian War, Virginia—like England in 1689—disarmed Catholics who refused to take a loyalty oath. (*Id.* at PageID.109–110 (citing 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35–39 (1820) (1756 Va. Law)).) Similar to "the English law discussed above, the Virginia statute tied disarmament to failure to take a loyalty oath— and exempted those who took the oath after previously refusing." (*Id.* at PageID.110 (citing 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 38 (1820) (1756 Va. Law)).)

The government next states that during the Revolutionary War, "American legislatures passed numerous laws 'disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact'—often specifically targeting those who failed to demonstrate loyalty to the emergent American government." (*Id.* (quoting *Range*, 53 F.4th at 277).) A 1775 Connecticut law disarmed "any person convicted of 'libel[ing] or defam[ing]' any acts or resolves of the Continental Congress or the

51

Connecticut General Assembly 'made for the defence [sic] or security of the rights and privileges' of the colonies." (*Id.* (alterations in original) (quoting *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* 1993 (1890) (1775 Conn. Law)).)

Moreover, at least six governments—those of Massachusetts, Rhode Island, North Carolina, New Jersey, Pennsylvania, and Virginia—enacted legislation in line with the Continental Congress' recommendation in 1776 "that the colonial governments disarm those who were 'notoriously disaffected to the cause of America' or who simply 'have not associated' with the colonial governments in the war effort." (*Id.* at PageID.110–111 (quoting 4 *Journals of the Continental Congress 1774-1789* 205 (1906) (resolution of March 14, 1776); citing 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479–84 (1886) (1776 Mass. Law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. Law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. Law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* 90 (1777) (1777 N.J. Law); 9 *The Statutes at Large of Pennsylvania from*

*1682 to 1801* 112–13 (1903) (1777 Pa. Law); 9 *The Statutes at Large;*
*Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va.
Law)).) "A common feature of this set of laws was to require oaths of
loyalty to the government and to strip anyone who failed or refused to
take the oath of the right to bear arms." (*Id.* at PageID.111 (citing 1776
Mass. Law at 479–80; 1776 R.I. Law at 566–67; 1777 N.C. Law at 229–
31; 1777 Pa. Law at 111–13; 1777 Va. Law at 281–82).) "[T]he
Pennsylvania law"[28] "had the effect of depriving 'sizable numbers of
pacifists' of the right to bear arms 'because oath-taking violated the
religious convictions of Quakers, Mennonites, Moravians, and other
groups.'" (*Id.* at PageID.112 (quoting *Range*, 53 F.4th at 278).) The
government notes that this law is "particularly informative because the
year before enacting it, Pennsylvania became one of the first states to
adopt a state constitutional provision protecting an individual right to
bear arms." (*Id.* (citing *Heller*, 554 U.S. at 601; *Pa. Declaration of Rights*
*of 1776* § XIII, in *The Complete Bill of Rights: The Drafts, Debates,*
*Sources, And Origins* 278 (Neil Cogan ed., Oxford University Press 2d

---

[28] The Court presumes that the government's reference in its supplemental
brief to "[t]he Pennsylvania law" (ECF No. 19, PageID.112) is a reference to the
types of laws discussed in this paragraph. The government does not make this
connection entirely clear in its supplemental brief.

ed., 2014); N.C. Declaration of Rights of 1776 § XVII, in *The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins* 277–78 (Neil Cogan ed., Oxford University Press 2d ed., 2014); Mass. Const. of 1780, pt. I, art. XVII, in *The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins* 277 (Neil Cogan ed., Oxford University Press 2d ed., 2014)).)

In turning to the ratification debates, the government discusses various proposals whose language was not included in the Second Amendment. "[T]he Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that: 'no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.'" (*Id.* at PageID.114 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971)).) In addition, Samuel Adams proposed the following amendment at the Massachusetts convention: the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." (*Id.* at PageID.115 (alteration in original) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary*

*History* 675, 681 (1971)).) "And in New Hampshire, the convention recommended an amendment providing that 'Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion.'" (*Id.* (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 758, 761 (1971)).) The government states that these proposals "recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry." (*Id.*) The government also states that "it would have been 'obvious' to the founders that certain groups, including (but not necessarily limited to) 'the felon,' [Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868)], could properly be subject to disarmament laws consistent with the '*pre-existing* right' that was 'codified' in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 . . . ." (*Id.* at PageID.115–116 (emphasis in original) (citing Akhil Reed Amar, *The Bill of Rights* 48 (1998); Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008)).)

The Court concludes that the historical regulations and proposals offered by the government to show a historical tradition of disarmament

based on "untrustworthiness" do not satisfy *Bruen*'s "relevantly similar" standard. The burden on the right of armed self-defense imposed by the historical regulations discussed above and by § 922(g)(1) is comparably justified; however, the burden itself is not sufficiently analogous, as explained below.[29]

---

[29] In reaching this conclusion, the Court does not rely on the government's discussion of certain proposals made during the ratification debates. The Court agrees with Defendant that "the perspective of the *Rahimi* court is instructive" for purposes of evaluating these proposals. (ECF No. 22, PageID.215.)

In *United States v. Rahimi*, the Fifth Circuit considered whether 18 U.S.C. § 922(g)(8)—which prohibits the possession of firearms by a person subject to a domestic violence restraining order—is constitutional under the Second Amendment in light of *Bruen. United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023). The Fifth Circuit reviewed two of the proposals mentioned above that were also offered by the government in *Rahimi*: the proposals from the Pennsylvania and Massachusetts conventions. *Id.* at 457. In determining that the government's "potential historical analogues . . . falter[ed] as 'relevantly similar' precursors to § 922(g)(8)," *id.* at 456, the Fifth Circuit found that

> the[ ] proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right. While they were influential proposals, *see Heller*, 554 U.S. at 604, 128 S. Ct. 2783, neither became part of the Second Amendment as ratified. Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)(8) because, *inter alia*, they were not enacted. *Cf. Bruen*, 142 S. Ct. at 2137 ("[T]o the extent later history contradicts what the text [of the Second Amendment] says, the text controls.").

*Id.* at 457 (alterations in original).

The same analysis applies here. The proposals referenced by the government in this case—including the two proposals offered by the government in *Rahimi*—

Regarding the issue of a comparable justification, the historical regulations and § 922(g)(1) have overlapping justifications for disarmament. The statutes enacted by the English government, by the American colonial governments, and during the Revolutionary War demonstrate a historical tradition of legislatures categorically disarming individuals who were not trusted to obey the rule of law or who were believed to be inadequately faithful to the government and its laws. The burden imposed by the historical laws and by § 922(g)(1) is "comparably justified" because "the *why* behind [the] historical . . . laws analogously aligns with that underlying § 922(g)([1])." *Rahimi*, 61 F.4th at 460 (emphasis in original).

But the "relevantly similar" inquiry under *Bruen* does not end with a finding of a comparable justification. *Bruen* instructs that courts must also evaluate "whether modern and historical regulations impose

---

"cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)([1])," given that they did not become part of the Second Amendment. *Id.*; *see United States v. Goins*, 647 F. Supp. 3d 538, 549 (E.D. Ky. 2022) (finding that the proposals at the Pennsylvania, Massachusetts, and New Hampshire conventions "are of limited help" in the government's efforts to support § 922(g)(1) because "[u]ltimately, these were merely suggestions that did not carry their conventions and are not indicative of a consensus that the right to bear arms was limited to persons without a criminal record"). Yet even if the Court were to consider the proposals at issue, nothing in the language of the proposals requires the Court to come to a different conclusion.

57

a comparable burden on the right of armed self-defense." *Bruen*, 597
U.S. at 29. Here, the government fails to make the necessary showing of
a comparable burden. Section 922(g)(1) "imposes a far greater burden
on the right to keep and bear arms than the historical categorical
exclusions from the people's Second Amendment right." *Prince*, 2023
WL 7220127, at *9.

Section 922(g)(1) permanently prohibits felons from possessing
firearms. Yet none of the historical regulations offered by the
government permanently disarm a group of people. The English law
from 1689 that disarmed "any Catholic who refused to make a
declaration renouncing his or her faith" permitted the keeping of
weapons for self-dense. (ECF No. 19, PageID.105–106 (citing 1 W. & M.,
Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688)); *see* ECF No.
22, PageID.214 (citing Joseph G.S. Greenlee, *The Historical
Justification for Prohibiting Dangerous Persons from Possessing Arms*,
20 Wyo. L. Rev. 249, 261 (2020)).) In addition, an avenue existed under
that law for Catholics to fully recover their right to possess a firearm:
"anyone who decided to make the declaration after having previously
refused would regain the ability to keep and bear arms." (ECF No. 19,

PageID.106–107 (citing 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 72 (1688)); *see* ECF No. 22, PageID.214 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009)).)

In its supplemental brief, the government mentions "[f]irearm regulations directed toward disarming Native Americans and Black people" (ECF No. 19, PageID.107–108), but it provides no details about these regulations. A different court that considered a *Bruen* challenge to § 922(g)(1) found that Catholics, enslaved people, and Native Americans were not subjected to an absolute ban on firearm possession:

> Importantly, although Catholics, enslaved people, and Native Americans were prohibited from firearm possession, individuals within these groups could possess firearms under certain circumstances. For example, Catholics who were "'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms" when they pledged allegiance to the United States or a particular state. Kanter, 919 F.3d at 456–58. Enslaved people could possess firearms if they had permission from their master.[3] See, e.g., The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments, at 117–18 (1811) (1715 Md. Law) (prohibiting enslaved people from taking weapons off their master's land "without license from their said master"); A Digest of the Laws of the State of Georgia From

<u>Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799</u>, at 153–55 (1800) (1768 Ga. Law); <u>Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne</u>, at 341 (1753) (1694 N.J. law).

Moreover, the government does not provide evidence that Native Americans were prohibited from <u>possessing</u> firearms, except one Rhode Island law from 1677 that allowed the confiscation of guns owned by Native Americans if they did not have the necessary "ticket or order." <u>Records of the Colony of Rhode Island and Providence Plantations</u>, at 561 (1857) (1677 R.I. law). Instead, state legislatures typically prohibited the <u>sale</u> of firearms to Native Americans, not possession itself. <u>See</u>, <u>e.g.</u>, <u>Laws and Ordinances of New Netherland, 1638-1674</u>, at 18–19 (1868) (1639 New Netherland law); <u>Records Of The Colony Of New Plymouth, in New England</u>, at 243 (1856) (1675 Plymouth law).[4]

_____

[3] Of course, enslaved people were not considered to be citizens of the United States, and consequently were not protected by the Constitution. <u>See</u> <u>United States v. Jimenez-Shilon</u>, 34 F.4th 1042, 1047 (11th Cir. 2022).

[4] Indeed, members of the Native American tribes were considered to be citizens of hostile foreign nations, and thus not included in "the people" protected by the Second Amendment. <u>See</u> <u>United States v. Jimenez-Shilon</u>, 34 F.4th 1042, 1047 (11th Cir. 2022).

*Prince*, 2023 WL 7220127, at *7 (emphasis in original).

Further, the laws in the historical record from colonial America and the Revolutionary War that required a loyalty oath did not impose a permanent and absolute restriction on the right to keep and bear arms. Those laws provided that "members of the[ ] [targeted] groups could regain the ability to keep and bear arms after taking the relevant oath." *Id.*

Unlike the historical laws discussed above, § 922(g)(1) does not allow felons to possess firearms "under certain circumstances." *Id.* Nor does § 922(g)(1) give felons an opportunity to fully regain their rights by making a declaration renouncing their faith or by taking a certain loyalty oath or even a pledge to use the firearm only for a lawful purpose. "There is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law." *Id.* at *9. Thus, the Court

> is not persuaded that the government has met its burden to show a . . . historical analogue to § 922(g)(1)'s <u>permanent</u> prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a "conviction" under § 922(g). 18 U.S.C. § 921(a)(20). . . . [F]or example, if a felon with one felony conviction receives

> an executive pardon for that conviction, he is no longer a
> felon with a "crime punishable by imprisonment for a term
> exceeding one year" under the statute.

*Id.* at \*8 (emphasis in original).

Accordingly, the Court concludes that the historical regulations identified by the government and § 922(g)(1) do not impose "a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29. The government therefore fails to show that the historical regulations that disarmed "untrustworthy" individuals are "relevantly similar" to § 922(g)(1).

> b.   *Historical Regulations that Authorized Capital*
> *Punishment and Estate Forfeiture*

The government asserts that England, the American colonies, and the American states authorized capital punishment and estate forfeiture as punishment for felonies. (*See* ECF No. 19, PageID.132–133.) It enumerates various laws enacted between 1700 and 1788 that punished certain crimes with death or forfeiture. The government argues that, based on these laws, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." (*Id.* at PageID.137 (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C.

Cir. 2019)). The laws offered by the government are discussed below in chronological order.

"[A] 1700 Pennsylvania law provided that any person convicted of 'wil[l]fully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor.'" (*Id.* at PageID.135 (quoting 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 12 (1896)).) "A 1705 Pennsylvania law provided that a person convicted of rape 'shall forfeit all his estate if unmarried'" and one-third of their estate if married. (*Id.* (quoting 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 178 (1896)).) That law also punished the rape conviction with "31 lashes and imprisonment for 'seven years at hard labor.'" (*Id.* at PageID.135–136 (quoting 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 178 (1896)).) In addition, "[a] 1715 Maryland law provided that anyone convicted of 'corruptly embezzling, impairing, razing, or altering any will or record' that resulted in injury to another's estate or inheritance 'shall forfeit all his goods and chattels, lands and tenements.'" (*Id.* at PageID.136 (quoting 1 *The Laws of Maryland With the Charter, The Bill of Rights, the Constitution of the*

*State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811)).)

Under a 1743 Rhode Island law, "any person convicted of forging or counterfeiting bills of credit" was "adjudged guilty of Felony" and was to "suffer the Pains of Death." (*Id.* (quoting *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33–34 (1767)).) The law also provided that "any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and 'forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony.'" (*Id.* (quoting *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33–34 (1767)).) "And a 1750 Massachusetts law provided that rioters who refused to disperse 'shall forfeit all their lands and tenements, goods and chattles [sic],' in addition to receiving 39 lashes and one year's imprisonment." (*Id.* (quoting 3 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 545 (1878)).)

In 1777, Virginia adopted a law that provided that "anyone convicted of forging, counterfeiting, or presenting for payment a wide

range of forged documents 'shall be deemed and holden guilty of felony, [and] shall forfeit his whole estate, real and personal . . . .'" (*Id.* at PageID.134–135 (quoting 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (1821) (1777 Va. Forgery Law); citing *A Digest of the Laws of Maryland* 255–56 (1799)).) That person "shall receive on his bare back, at the publick [sic] whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." (*Id.* at PageID.135 (quoting 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (1821) (1777 Va. Forgery Law); citing *A Digest of the Laws of Maryland* 255–56 (1799)).) In addition, Maryland forgery laws enacted between 1776 and 1778 each "provided that those convicted 'shall suffer death as a felon, without benefit of clergy.'" (*Id.* (quoting *A Digest of the Laws of Maryland* 255–56 (1799)).)

In 1786, New York "passed a law severely punishing counterfeiting bills of credit." (*Id.* at PageID.134 (citing 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*

260–61 (1886) (1786 N.Y. Law)).) The law provided that "a counterfeiter 'shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor.'"[30] (*Id.* (alteration in original) (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 261 (1886) (1786 N.Y. Law)).) In 1788—three years before the ratification of the Second Amendment—New York passed a law that punished those convicted of certain crimes[31] with death and forfeiture of "all . . . goods and chattels, and also all such lands, tenements, and hereditaments[ ] . . . at the time of any such offence committed, or at any time after." (*Id.* at PageID.133–134 (alterations in original) (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 666 (1886) (1788 N.Y. Law)).) "[O]ther felonies"

---

[30] The 1786 New York law further provided that a person convicted of counterfeiting bills of credit would be "branded on the left cheek with the letter C, with a red hot iron" in order "to prevent escape." (ECF No. 19, PageID.134 (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 261 (1886) (1786 N.Y. Law)).)

[31] These crimes included counterfeiting, burglary, robbery, arson, and malicious maiming and wounding. (ECF No. 19, PageID.133 (citing 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 664–65 (1886) (1788 N.Y. Law)).)

were punished by that law as follows: "the first offence [sic]" was punished through a "fine, imprisonment, or corporal punishment"; "any second offence [sic]" committed after the first conviction was punished with "death." (*Id.* at PageID.134 (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 665 (1886) (1788 N.Y. Law)).)

In its filings, the government makes no effort to show that the regulations it identifies are "relevantly similar" to § 922(g)(1). The Court cannot conclude that such similarity exists based on the record before it, particularly because the government does not establish that the historical laws authorizing death and forfeiture imposed a "comparable burden" to that imposed by § 922(g)(1). As the Third Circuit determined in *Range v. Att'y Gen.*,

> government confiscation of . . . a convicted criminal's entire estate[ ] differs from a status-based lifetime ban on firearm possession. The Government has not cited a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime. Nor has the Government cited forfeiture cases in which the convict was prevented from regaining his possessions, including firearms (except where forfeiture preceded execution).

*Range*, 69 F.4th at 105 (en banc).

67

With respect to laws authorizing capital punishment, the Third Circuit in *Range* is instructive as well. In considering historical regulations that punished some felonies with death, the Third Circuit concluded:

> That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. Krause Dissent at 127–28.

*Id.* (emphasis in original). "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."[32] *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).

---

[32] The Court notes that "at common law, the 'idea of felony' was intertwined with the punishment[ ] of death," *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting), but

> [d]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray. . . . Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on the whole, not capital." LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993). By the time the Constitution was ratified, James Wilson observed that while the term "felony" was once "very strongly connected with capital punishment," that was no longer true. JOHN D. BESSLER, CRUEL & UNUSUAL 52–53 (2012) (quoting 2 THE WORKS OF JAMES WILSON 348 (James DeWitt Andrews ed., 1896)); *see also* 6 NATHAN DANE, DIGEST OF AMERICAN LAW 715 (1823) ("[W]e have many felonies, not one punished with forfeiture of estate, and but a very few with death."). Of course, many crimes remained eligible for the death penalty, and the extent to which that was true varied by state. Death, however, no longer inevitably followed a felony conviction.

*Id.* at 459 (Barrett, J., dissenting); *see United States v. Goins*, 647 F. Supp. 3d 538, 550 (E.D. Ky. 2022) ("It is . . . unclear that the colonies and early states universally applied the death penalty to felonies.").

In this case, some of the statutes the government references did not punish felonies with death and thus support the principle discussed in the previous paragraph. For example, "a 1700 Pennsylvania law provided that any person convicted of 'wil[l]fully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor.'" (ECF No. 19, PageID.135 (quoting 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 12 (1896)).) A 1705 Pennsylvania law punished a rape conviction with estate forfeiture, "31 lashes and imprisonment for 'seven years at hard labor.'" (*Id.* at PageID.135–136 (quoting 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 178 (1896)).) "A 1715 Maryland law provided that anyone convicted of 'corruptly embezzling, impairing, razing, or altering any will or record' that resulted in injury to another's estate or inheritance 'shall forfeit all his goods and chattels, lands and tenements.'" (*Id.* at PageID.136 (quoting 1 *The Laws of Maryland With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811)).) A 1777 Virginia law provided that "anyone convicted of forging, counterfeiting, or

In sum, the government provides no historical basis for the Court to conclude that regulations authorizing capital punishment and estate forfeiture necessarily disarmed felons for life. *See id.* at 461 (Barrett, J., dissenting) ("[A] felony conviction and the loss of all rights did not necessarily go hand-in-hand."). The government has therefore not made the required showing that the historical laws and § 922(g)(1) impose a "comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29. As a result, the Court cannot find "relevant similarity" between those earlier laws and § 922(g)(1).

---

presenting for payment a wide range of forged documents 'shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick [sic] whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years.'" (*Id.* at PageID.134–135 (quoting 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (1821) (1777 Va. Forgery Law); citing *A Digest of the Laws of Maryland* 255–56 (1799)).) Finally, a 1786 New York law "punishing counterfeiting bills of credit" provided that "a counterfeiter 'shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor.'" (*Id.* at PageID.134 (alteration in original) (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 261 (1886) (1786 N.Y. Law)).) The convicted person would also be "branded on the left cheek with the letter C, with a red hot iron" in order "to prevent escape." (*Id.* (quoting 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 261 (1886) (1786 N.Y. Law)).)

Moreover, the historical regulations allowing for execution and forfeiture are not sufficiently analogous to § 922(g)(1) for an additional reason: whereas the historical laws allowed for execution and forfeiture as *punishment* for certain felonies, § 922(g)(1) imposes a lifetime ban on gun possession by felons as a *consequence* of their conviction.[33] As the court stated in *United States v. Prince*,

> dispossession [under § 922(g)(1)] is not a "punishment" for a felon's conviction <u>per se</u>; it is a consequence of a felon's status as an untrustworthy, lawbreaking citizen, and his conviction not only causes this status, but is evidence of it. Conversely, historical regulations that tied an individual's felony conviction to severe consequences (capital punishment and estate forfeiture) imposed <u>punishment</u> for the individual's crime, making them distinct from § 922(g)(1).[34]

---

[33] The government's supplemental brief appears to contain language recognizing this distinction. (*See* ECF No. 19, PageID.121 ("[S]ection 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability 'as a legitimate consequence of a felony conviction,' *Tyler*, 837 F.3d at 708.").) The government seemed to acknowledge this distinction during the hearing as well.

[34] The court in *Prince* provided the following helpful explanation regarding the distinction between the punishment for a felony conviction and the consequence of such a conviction:

> [A]fter a felon is convicted, he can also lose the right to vote, serve on a jury, and hold elected office. The loss of these rights is not <u>punishment</u> for a felony-level crime; it is a consequence of the legislature's determination that, categorically, that individual is now part of [a]

*Prince*, 2023 WL 7220127, at *10 (emphasis in original).

Thus, the government in this case fails to establish "relevant similarity" between § 922(g)(1) and historical regulations that authorized capital punishment and estate forfeiture. The government does not show that the historical regulations imposed a burden comparable to that imposed by § 922(g)(1). Further, those regulations are distinguishable from § 922(g)(1). They provided for punishment for certain felony offenses; § 922(g)(1), in contrast, is a consequence of a felony conviction.

Accordingly, the government does not satisfy its burden under *Bruen* to "justify [§ 922(g)(1)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597

---

group of individuals (felons) who cannot be trusted to abide by the law, or otherwise act as trustworthy members of the political community, based on their actions. If that individual is convicted of another felony, he will receive additional punishment in the form of imprisonment, which presumably punishes, deters, and/or rehabilitates him. He will not, and logically could not be stripped again of his right to vote, serve on a jury, or hold elected office, which he permanently lost following his first felony. Instead, he remains a member of that category of "untrustworthy" or otherwise "unvirtuous" individuals whose firearm possession has been historically limited.

*United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *10 (N.D. Ill. Nov. 2, 2023) (emphasis in original).

U.S. at 24. The government does not point to a historical regulation that is "distinctly similar" to § 922(g)(1). Nor does it show that the laws in the historical record are "relevantly similar" to § 922(g)(1). Those laws do not impose a "comparable burden" to § 922(g)(1)'s permanent and absolute ban on the possession of firearms by felons. Because the government does not identify a historical analog that is "distinctly similar" or "relevantly similar" to § 922(g)(1), the Court is required by *Bruen* to find the statute unconstitutional as applied to Defendant. The Court must grant Defendant's motion to dismiss the indictment.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant's motion to dismiss the indictment. (ECF No. 13.)

IT IS SO ORDERED.

Dated: February 22, 2024          s/Judith E. Levy
     Ann Arbor, Michigan          JUDITH E. LEVY
                              United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 22, 2024.

                         s/William Barkholz
                         WILLIAM BARKHOLZ
                         Case Manager